## Town of Killington v. State of Vermont, Edward D. Haase, Commissioner of Taxes and Marc Hull, Commissioner of Education

[776 A.2d 395]

No. 99-286

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed April 20, 2001

· *Mark L. Sperry* and *Devin McLaughlin* of *Langrock Sperry & Wool*, Middlebury, for Plaintiff-Appellee.

*William H. Sorrell*, Attorney General, *William E. Griffin*, Chief Assistant Attorney General, and *Mary L. Bachman*, Special Assistant Attorney General, Montpelier, for Defendants-Appellants.

**Johnson, J.** In this appeal concerning a transition provision of Vermont's school funding law, we confront a familiar dispute in which one side claims the benefit of the common and ordinary meaning of the statutory language, while the other side relies primarily on the legislative purpose of the statute to give meaning to the term at issue. The provision in question capped for a two-year period the anticipated rapid rise in property taxes in the so-called "gold" towns resulting from the passage of the Equal Educational Property Act of 1997 (hereinafter "Act 60"). The statute saved appellee Town of Killington[1] approximately $1,200,000 in taxes for the first transition year after Act 60 became law. Killington claimed, however, that it was entitled to roughly $500,000 in additional tax savings because the State applied an incorrect methodology in calculating Killington's increase in municipal expenditure growth during the first transition year. The superior court agreed, ruling that the commonly understood meaning of the statutory term "municipal budget" required the State to calculate Killington's municipal expenditure growth in terms of the increase in gross expenditures rather than the increase in expenditures funded by taxes.

The State of Vermont and the Commissioners of the Departments of Education and Taxes ("the State") appeal the superior court's grant of summary judgment in favor of Killington. We reverse and enter summary judgment in favor of the State based on our conclusion that the court's construction of the statutory provision at issue leads to an irrational result that is inconsistent with the spirit of the law and the legislative intent underlying the provision.

The fundamental purpose of Act 60 is "to make educational opportunity available to each pupil in each town on substantially equal terms." 16 V.S.A. § 4000(a). The Legislature sought to attain equal access to similar revenues per pupil through a combination of state block grants and local education spending that would allow each school district to "have substantially equal capacity to raise and provide the same amount per pupil on the local tax base." 16 V.S.A. § 4000(b). Act

---

[1] After the filing of this lawsuit, the Town of Sherburne changed its name to the Town of Killington.

60 represented the Legislature's response to *Brigham v. State*, 166 Vt. 246, 692 A.2d 384 (1997), in which we held that Vermont's educational financing system, with its wide disparities in per pupil spending and property tax burdens necessary to fund that spending, violated the common benefits clause, Chapter I, Article 7, of the Vermont Constitution. The Legislature chose to respond, in large part, by redistributing property tax revenues so that an equivalent tax rate in any town in Vermont produced the same per pupil resources for educational spending. In some towns, the maintenance of the historic level of educational spending would require substantial, even dramatic, increases in property tax rates to fund education. To reduce the shock of property tax increases in the property-rich towns, the Legislature chose to phase in these increases over time. This litigation is about one of those phase-in provisions.

To produce equality, a fully implemented Act 60 imposes a statewide education property tax on all nonresidential and homestead property in every town in the state at a rate of $1.10 per $100 of equalized education property value. 32 V.S.A. § 5402(a). The law, however, contains a phase-in provision aimed at easing the transition in fiscal years 1999 and 2000 to the $1.10 rate for towns that enjoy relatively low property tax rates. See 1997, No. 60, § 50(a) (amended by 1997, No. 71 (Adj. Sess.), § 67(a)). The first component of that provision, which provides a three-year phase-in toward the uniform statewide rate, is not at issue in this appeal.

The second component, the one at issue here, caps at forty percent any increase in. a town's combined municipal, school district, and statewide property tax rate from fiscal year 1998 to fiscal year 1999.[2]

---

[2] For purposes of the Act, Killington's fiscal year 1999 is the period from January 1, 1998 to December 31, 1998, and Killington's fiscal year 1998 is the period from January 1, 1997 to December 31, 1997.

The original forty percent cap provision in Act 60 provided as follows:

No municipality shall be required to set a combined municipal, school district and statewide property tax rate which is more than 40 percent higher than its combined fiscal year 1998 municipal and school property tax rate, provided that any growth in the municipal budget of more than 10 percent in that year shall not be included in the calculation of the combined municipal, school district and statewide property tax rate for that year.

1997, No. 60, § 50(a).

This provision was later replaced, in relevant part, with the following provision, which sought to add a limitation on the growth of the education component of town budgets, in addition to the municipal component, during the transition years:

The forty percent cap provision assured that no town's combined tax rate would increase by more than forty percent in the first transition year following the passage of the new education funding law.

The cap provision was intended to protect towns against immediate and large tax increases created by Act 60. It was not intended, however, to protect against tax increases brought about by extraordinary spending increases. Indeed, if the cap provision allowed extraordinary spending, a town facing a forty percent property tax increase resulting from Act 60 could increase spending by forty percent, thereby retaining the benefit of the entire tax increase while avoiding a gradual increase in its burden under the statewide property tax rate. Rather than use the phase-in period, as intended, to gradually ratchet up its increased tax burden under the statewide rate, a town could increase its spending to a level that would allow it to avoid any increased payment under the statewide rate and Act 60's phase-in provisions.

To prevent such a scenario but still allow towns a reasonable increase in spending during the phase-in period, the cap provision included two spending control provisions, one on education spending and one on municipal spending. The former is not involved here. The latter provides that any increase in the "municipal budget" from fiscal years 1998 to 1999 that exceeds ten percent may not be applied in calculating the forty percent cap on the increase in the combined tax rate for fiscal year 1999. In sum, the increase in the combined tax rate of towns from fiscal year 1998 to fiscal year 1999 was capped at forty percent, except that, in relevant part, any growth in the municipal

If, in fiscal year 1999, in order to fund that portion of a municipal budget which is no greater than 110 percent of its fiscal year 1998 municipal budget and to fund that portion of an education budget which is no greater than its fiscal year 1998 education budget adjusted by any increase in the index for state and local purchases of goods and services and for any extenuating circumstances as determined by the commissioner, a municipality's combined municipal, school district and statewide equalized property tax rate is more than 40 percent higher than its combined municipal and education equalized tax rate in fiscal year 1998, then the education property tax rates for fiscal year 1999 established by this section for that municipality shall be reduced. The statewide education property tax rate shall be reduced by an amount which will result in a combined municipal, school district and statewide education equalized tax rate for the municipality in fiscal year 1999 which does not exceed by more than 40 percent the combined municipal and education equalized tax rate of the municipality for fiscal year 1998.

1997, No. 71 (Adj. Sess.), § 67(a).

budget exceeding ten percent would not be included in the calculation of the combined tax rate for that year.

Looking at the specifics of this case, Killington is a property-rich town that faces significant property tax increases under Act 60. Thus, its increase in property tax rates during the phase-in period is limited by the forty percent cap, however it is construed. The gist of the State's claims is that Killington has improperly drawn from its forty percent property tax increase for the first interim year by increasing funds for municipal spending well above the ten percent limit and intentionally generating a large surplus that can be spent in future years. Killington responds that it is simply following the letter of the phase-in provision, and that the State is distorting its clear language in pursuit of a claimed legislative intent that it has invented.

The facts giving rise to the claims are these. Killington had a municipal budget in fiscal year 1998 of $1,951,000. In fiscal year 1999, Killington voted a municipal budget of $2,146,100, precisely ten percent above the fiscal year 1998 budget. Because of different revenue assumptions underlying the two budgets,[3] however, Killington

---

[3] In each of its budget calculations before fiscal year 1998, the year following the passage of Act 60, Killington included nontax revenues–delinquent tax collections, licensing fees, etc. — before arriving at the total amount to be raised by taxes. Killington's estimated nontax revenue was $322,000 in fiscal year 1993 and gradually increased each year until it reached $360,000 for fiscal year 1997, with an estimate of $378,000 for the coming year. That year, the $378,000 in nontax revenues and $30,000 in excess cash was deducted from Killington's projected total expenditures of $1,951,000 to arrive at the sum of $1,543,000 that needed to be raised in taxes to pay for those expenditures. In fiscal year 1998, however, Killington did not, as in past years, subtract the estimated nontax revenue (listed in the annual report at $458,364) from its expenditures before arriving at the total amount needed to be raised by taxes for either fiscal year 1998 or fiscal year 1999. Unlike previous years, nontax revenue was omitted from the budget summary and thus simply not made part of the equation in reaching the figure for the total amount of expenditures needed to be raised through taxes. In short, for the first time, Killington set its tax rate to fund one hundred percent of its projected expenditures, without reducing that amount to reflect the collection of nontax revenues. As a result, Killington set its total municipal expenditures at $1,951,000 for fiscal year 1998 and $2,146,100 for fiscal year 1999, the latter figure being exactly 110 percent of the former figure. The State believed that Killington was comparing apples and oranges in calculating the ten percent increase in municipal budget growth from fiscal year 1998 to fiscal year 1999. From the State's perspective, if Killington was not going to include nontax revenues in the 1999 fiscal year budget, it should have calculated the permissible ten percent growth in the municipal budget by adding ten percent to the amount of expenditures from fiscal year 1998 that needed to be funded by taxes, not to the amount of total expenditures from fiscal year 1998, including nontax revenues. Indeed, Killington's budgeted *tax* revenues increased thirty-eight percent from fiscal year 1998 to fiscal year 1999.

voted a thirty-eight percent increase in the municipal property tax rate to fund the fiscal year 1999 budget. The ostensible reason for the large tax increase was the assumption that the entire fiscal year 1999 budget would be funded by property tax payments for current year billing; whereas, the assumption in fiscal year 1998 and all prior years was that a substantial part of the budget would be funded by delinquent tax payments and other income not generated by current-year tax payments.

Not surprisingly, in determining how much Killington was required to send to the education fund, the State noted the discrepancy between the ten percent budget increase claimed by Killington and the apparent thirty-eight percent property tax increase. It determined that the budget figures from fiscal years 1998 and 1999 used by Killington to calculate the ten percent increase were not comparable because they resulted from different revenue assumptions. In the State's view, Killington simply overtaxed itself in fiscal year 1999, thereby lowering its obligation to the statewide education fund and, at the same time, allowing itself to enjoy a surplus of municipal funds that could be used for future expenditures.

In resolving the discrepancy resulting from the inconsistent revenue assumptions in Killington's fiscal year 1998 and 1999 budgets, the State chose to accept the assumptions made in the fiscal year 1999 budget and contest the asserted fiscal year 1998 budget. To allow the municipal budgets from fiscal years 1998 and 1999 to be compared so that the ten-percent growth could be calculated, the State considered only that part of those expenditures from the fiscal year 1998 budget covered by current-year taxes.[4] The State might well have chosen instead to contest the fiscal year 1999 budget on the ground that it did not include nonrevenue income and thus was incomparable to the previous year's budget. In any event, either contest would have reached the same result.

In July 1998, Killington filed a declaratory judgment action in superior court. The parties submitted competing motions for summary judgment, and the superior court ruled in favor of Killington. The court concluded that the common and ordinary meaning of the term "municipal budget," as defined in the forty percent cap provision,

---

[4]The State multiplied $1,552,307, the amount of taxes assessed by Killington in fiscal year 1998 to fund its gross expenditures, by 110 percent and arrived at the sum of $1,707,536. From that figure, the State then calculated Killington's education tax rate and its liability to the statewide education fund for fiscal year 1999.

comported with Killington's position, which construed the term to encompass the expected expenditures and revenues projected for the coming year. As for the intent of the Legislature, the court opined that if the Legislature had intended municipal growth to be measured in terms of the increase in taxes, it would have used the term "municipal tax rate," as it had in other contexts throughout Act 60 — including the forty percent cap provision itself, rather than the term "municipal budget."

On appeal, the State argues that the superior court erred by focusing exclusively on the term "municipal budget" and ignoring the purpose and spirit of the education funding law in general and the forty percent cap provision in particular. In the State's view, the term "municipal budget" is susceptible to several different meanings, but, when examined in the context of the forty percent cap provision, which is aimed at protecting property owners from sudden and significant rate increases resulting from the implementation of Act 60, the term can only refer to that portion of municipal expenditures that are funded by taxes. According to the State, a broader interpretation of the term would allow towns such as Killington to manipulate the municipal tax rate so as to create a surplus of municipal funds while lowering their liability to the statewide education fund.

Killington responds that the plain and ordinary meaning of the term "municipal budget" is the total town expenditures as approved by the voters. Killington asserts that the plain meaning of the term is neither irrational nor inconsistent with Act 60 and thus should be construed as it is commonly understood. Killington further asserts that its budget projections were made in good faith, and that, in any event, it would be improper and impractical for this Court to examine the motives behind a town's budgetary decisions.

■ In considering the parties' arguments, we bear in mind that the paramount goal of this Court in construing a statutory provision is to give effect to the intent of the Legislature. See *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996) (there are many rules of statutory construction, but the paramount one is "to discern and give effect to the intent of the Legislature"). If the meaning of the disputed statutory language is unambiguous and " 'resolves the conflict without doing violence to the legislative scheme,' " we accept the plain meaning as the intent of the Legislature without looking further. *In re Weeks*, 167 Vt. 551, 554, 712 A.2d 907, 909 (1998) (quoting *Lubinsky v. Fair Haven Zoning Bd.*, 148 Vt. 47, 49, 527 A.2d 227, 228 (1986)); see *State v. Rafuse*, 168 Vt. 631, 632, 726 A.2d 18, 19 (1998) (mem.) ("The

ordinary meaning of [statutory] language is presumed to be intended unless it would manifestly defeat the object of the provisions."). On the other hand, we will not enforce the common and ordinary meaning of statutory language if doing so would render the statute ineffective or lead to irrational results. *In re A.C.*, 144 Vt. 37, 42, 470 A.2d 1191, 1194 (1984). When the plain meaning of statutory language appears to undermine the purpose of the statute, we are not confined to a literal interpretation, but rather must look to the broad subject matter of the statute, its effects and consequences, and the purpose and spirit of the law to determine legislative intent. *Merkel v. Nationwide Ins. Co.*, 166 Vt. 311, 314-15, 693 A.2d 706, 707-08 (1997); see *Perry v. Medical Practice Bd.*, 169 Vt. 399, 406, 737 A.2d 900, 905 (1999) (in determining legislative intent, court must look to words of statute, legislative history and circumstances surrounding statute's enactment, and legislative policy that statute was designed to implement).

The term "municipal budget," which is undefined in Act 60, is not a term of art with a precise meaning. Rather, the word "budget" is vague and can have different meanings in different contexts. The parties themselves define the term in various ways that are not entirely consistent. As Killington points out, the State uses the term at times to mean tax rate and at other times to mean expenditures funded by taxes. Killington alternately defines the term to mean, on the one hand, the total expected expenditures approved by town voters and, on the other hand, the total expected expenditures as offset by the total expected revenues. Indeed, while contending on appeal that the ordinary meaning of budget is total expenditures as offset by total revenues, Killington asks this Court to affirm the superior court's judgment on the basis that the plain meaning of budget is gross expenditures.

Moreover, Killington's differing methods of calculating its municipal budget before and after the passage of Act 60 indicate the vagueness of the term. Before 1998, Killington's budget summary incorporated funding not only from current year tax assessments, but also from prior year tax collections and nontax revenues. But after the passage of Act 60, Killington removed its prior year taxes and its nontax revenues from its general fund budget calculation. The law provides that an increase of greater than ten percent in the "municipal budget" of fiscal year 1999 over the "municipal budget" of 1998 will not be included in the forty percent cap calculation. And yet, in effect, Killington applies inconsistent definitions to the same term "municipal budget" to calculate the increase in spending from one year to the

other. Killington then asserts that neither the State nor this Court may examine the changed calculation to determine if, in fact, a different methodology is being applied.

Rather, Killington would have this Court construe the term "municipal budget" in isolation, without regard to the inconsistency in its use of the term or the purpose of Act 60. Its argument is essentially that we must adhere to the plain and commonly accepted meaning of the term because those are the words chosen by the Legislature. In response to the State's contention that construing the term broadly would undermine the purpose of Act 60 by allowing property-rich towns to manipulate their budgets to create a surplus of municipal funds while reducing their liability to the general education fund, Killington asserts that the Legislature's choice of the term "municipal budget" was the result of a legislative compromise. According to Killington, the Legislature chose the term "municipal budget" rather than "municipal tax rate" or some other comparable term to appease the property-rich towns across Vermont that strongly opposed Act 60.

We find no support whatsoever for Killington's claim that the term "municipal budget" was the result of a legislative compromise. Killington has not provided, and we are unaware of, any legislative history or other evidence indicating that the term was the result of a legislative compromise. Absent evidence to support such a view, we will not assume that the Legislature intended a broad application of the term "municipal budget" to allow property-rich towns to manipulate their budgets to take the greatest advantage of the transition provision aimed at easing the burden of the expected increase in taxes caused by Act 60. A word as vague as "budget" is not plain enough for us to accept Killington's conjecture concerning a legislative compromise that would undermine not only the expressed primary purpose of Act 60 to achieve equal educational opportunity, but also the purpose of the forty percent cap provision to buffer the anticipated sharp increase in the taxes caused by the implementation of Act 60.

We do not feel constrained by the commonly understood meaning of the term municipal budget, assuming that there is one. See 2A N. Singer, Sutherland Statutory Construction § 48.01, at 302 (5th ed. 1992) (plain meaning rule cannot be used to thwart judicial inquiry into legislative intent behind statutory language that may appear plain upon superficial examination). Perhaps, if considered in isolation, the term "municipal budget" would be most commonly understood to mean a balance sheet of total expected receipts and expenditures. But

words may have a more precise meaning in the context of a special subject than they would otherwise have in general usage. *Id.* § 47.27, at 242.

█ There is little dispute as to the purpose behind the statutory provisions at issue here. From the broadest perspective, Act 60 is a remedial statute designed to rectify the inequality in educational opportunity in Vermont resulting from the state's heavy reliance on local property taxes to fund schools. See *Tarrant v. Department of Taxes*, 169 Vt. 189, 197, 733 A.2d 733, 739 (1999) (legislative intent must be derived from consideration of entire statute); *In re Dexter*, 93 Vt. 304, 312, 107 A. 134, 137 (1919) (remedial statute is one designed to cure mischief or remedy defect in existing laws). Therefore, we must construe the statute to accomplish that remedial purpose. *State v. Therrien*, 161 Vt. 26, 31, 633 A.2d 272, 275 (1993); see 3 N. Singer, *supra*, § 60.01, at 147 ("Remedial statutes are liberally construed to suppress the evil and advance the remedy."); *Viskup v. Viskup*, 150 Vt. 208, 211, 552 A.2d 400, 402 (1988) (remedial purpose for which legislation was enacted requires liberal construction so as to give full force and effect to legislative intent).

If we narrow our focus, the forty percent cap provision is intended to limit, during a transition period, the expected increase in property taxes incurred by property-rich towns as the result of Act 60. But if we narrow our focus even further to the component of the forty percent cap provision at issue in this case, that language allows no more than a ten percent increase in municipal growth in calculating the forty percent cap on tax increases resulting from Act 60. Plainly, the ten percent provision was intended to allow reasonable municipal growth within the cap calculation, but to prevent property-rich towns from reducing their liability to the general education fund by increasing municipal growth beyond the reasonable ten percent cushion.

Taken together, the focus of these provisions was on how to deal with the expected increase in the assessment of taxes caused by Act 60's goal of creating an equal educational opportunity for Vermont students. We cannot discern from the record whether the term "municipal budget" resulted from imprecise drafting or, as the State surmises, an attempt to prevent confusion with other terms in the same provision that included the term "tax rate." But we do know that the interpretation favored by Killington is inconsistent with the obvious intent of both Act 60 in general and its forty percent cap provision. See 2A N. Singer, *supra*, § 46.05, at 103 ("A statute is passed as a whole and not in parts or sections and is animated by one general

purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole."). Killington's interpretation would break the link between tax rate increases and the effect of Act 60, and instead would allow towns to create surpluses under the protection of the forty percent cap while at the same time reducing their liability to the statewide education fund. Accordingly, we reject Killington's plain-meaning analysis of the term "municipal budget." See *id.* at 105 (legislature is presumed to have definite purpose for every enactment and has formulated subsidiary provisions in harmony with that purpose, which is limitation on meaning of general terms and touchstone for expansion of narrower terms).

 We conclude that the State's methodology for calculating Killington's municipal budget growth from fiscal year 1998 to fiscal year 1999, which applies a consistent definition for the term municipal budget from one fiscal year to the next, comports with the Legislature's intent to limit the amount of municipal budget growth that can be considered in calculating the forty percent cap on increased taxes resulting from Act 60. Killington does not deny that its interpretation of the term "municipal budget," in contrast, would allow towns to create such municipal surpluses while reducing their liability to the statewide education fund. Nevertheless, Killington contends that it would be inappropriate and impractical for this Court to examine the inner workings of municipal budgets to determine whether local officials are acting in good faith regarding their responsibility to the statewide education fund. We agree, but this is merely one more reason why Killington's broad interpretation of the term "municipal budget" outside of its statutory context would lead to irrational results and would undermine the purpose of Act 60.

In upholding the State's interpretation of the forty percent cap provision, we are following our well-established rule that "the interpretation of a statute by the administrative body responsible for its execution will be sustained on appeal absent compelling indication of error." *Mountain Cable Co. v. Department of Taxes*, 168 Vt. 454, 458, 721 A.2d 507, 510 (1998); see *Tarrant*, 169 Vt. at 195, 733 A.2d at 738 (same). Further, the State's interpretation of the provision has been, as least implicitly, endorsed by the Joint Legislative Oversight Committee on Restructuring Education, which was expressly created in Act 60 to "conduct a continuing review of the actions and policies of the Department of Education, Department of Taxes, school districts and other entities of educational governance in the state in the

implementation of the provisions of this act." 1997, No. 60, § 90(b); see also *id.* § 90 (e) ("The Joint Committee shall also review and advise on agency and departmental rules and policies relating to quality and funding of public education and the implementation of the provisions of this act.").

In a November 1997 letter responding to questions on the forty percent cap provision posed by the Town of Dover, the chair of the oversight committee stated that "no matter how high the increase in municipal taxes, only last year's municipal *tax rate* plus a 10% increase will be used for purposes of [the forty percent cap] calculation." (Emphasis added.) The chair also made this position known to the members of the Senate Finance Committee in a February 16, 1998 hearing in which proposed amendments to Act 60 were being considered.

Killington protests that the oversight committee was not directly responding to a question concerning the meaning of the term "municipal budget," and that it is impossible to tell what amendments were being considered at the time the chair read portions of her letter to the Senate Finance Committee. Killington also cites *State v. Madison*, 163 Vt. 360, 373, 658 A.2d 536, 545 (1995), for the proposition that the post-hoc reaction of a committee of lawmakers cannot retroactively provide legislative history for an earlier law.

We do not find these arguments persuasive. The official letter of the committee established to oversee Act 60 plainly set forth an interpretation of the forty percent cap provision that measured an increase in the tax rate rather than an increase in gross expenditures — essentially the same position taken by the agencies administering the statute. Moreover, regardless of what amendments were being considered at the February 1998 Senate Finance Committee hearing, its members were at least made aware of the position taken by the oversight committee, and yet no amendment was made to alter that position. Finally, in *Madison*, we stated that "legislative intent does not *necessarily* become apparent from the post-hoc reaction of a committee of lawmakers," holding that "the inconclusive legislative history" relied on by the defendant was "insufficient to overcome the plain meaning of the term" at issue. *Id.* at 373-74, 658 A.2d at 545 (emphasis added). We also noted that, far from creating an absurd result, applying the plain meaning of the statutory term would produce a more reasonable result than that proposed by the defendant. *Id.* at 374, 658 A.2d at 545.

The instant case is easily distinguishable. Here, unlike *Madison*, the evidence of legislative intent is from an oversight committee established by the very act being interpreted to implement the statute and oversee the rules and policies of the administrative agencies and school districts concerning the act. Thus, the contemporaneous legislative history is entitled to greater weight. See *Energy Action Educ. Found. v. Andrus*, 654 F.2d 735, 750 n.74 (D.C. Cir. 1980) (views of later Congress generally form hazardous basis for inferring intent of earlier one, but there is reason to give "greater weight than usual to the views of a post-enactment oversight committee charged with responsibility for supervising the administration of the Act"), *rev'd on other grounds by* 454 U.S. 151 (1981); cf. *United Hosp. Ctr., Inc. v. Richardson*, 757 F.2d 1445, 1451 (4th Cir. 1985) (regulations presented to oversight committee by administering agency without disapproval are entitled to considerable weight as expressive of legislative purpose); *Fredericks v. Kreps*, 578 F.2d 555, 561, 563 (5th Cir. 1978) (deference is especially warranted where administrative practice in question involves contemporaneous construction of statute with acquiescence of its construction by congressional oversight committees). More importantly, in contrast to *Madison*, the legislative history in this case is being offered to counter a proposed plain-meaning interpretation that would create irrational results and thwart legislative intent.

Killington also contends that the Department of Taxes, Division of Property Valuation and Review's interpretation of the term "municipal budget" to mean expenditures funded by taxes is inconsistent with the Department of Education's interpretation of the term "education budget" to mean gross expenditures spent for education. According to Killington, the State's application of differing methodologies to calculate the increases in education and municipal budgets demonstrates that the State is ascribing different meanings to the same word ("budget") in the same provision. We find no fundamental inconsistency in the methodology used by the State to calculate increases in the municipal and school budgets.

Under Act 60, as amended by Act 71, the education budget of towns was permitted to increase in fiscal year 1999, and still be within the forty percent cap, by the amount of any increase in the index for state and local purchases of goods and services. 1997, No. 71 (Adj. Sess.), § 67(a). That increase was 2.78 percent. As Killington contends, the Department of Education applied the 2.78 percent increase to Killington's *gross* education expenditures. In the next step of its

calculation, however, the Department reduced the sum obtained in the first step by the amounts of the general state support grant and the locally budgeted revenues, including anticipated expenditures by nontax revenues such as mainstream block grants for special education and state aid for transportation. Thus, the Department of Education's methodology, like the one applied by the Division of Property Valuation and Review, ultimately calculated the allowable growth under the forty percent cap provision by measuring the increase in expenditures funded by taxes, albeit at a different step in the calculation. Killington has not challenged the correctness of the Department of Education's calculation with respect to the growth in its education budget, and yet the methodology employed by the Department would have yielded essentially the same result as that employed by the Division of Property Valuation and Review with respect to its calculation of the growth in Killington's municipal budget.[5]

In summary, the structure and purpose of Act 60 make it apparent that the Legislature intended to protect, under the transitional forty percent cap provision, a ten percent increase in municipal expenditures funded by taxes. A calculation of the increase in municipal budget growth based on expenditures funded by taxes comports with the Legislature's intent to cap tax rate increases only if related to the new educational funding law. Further, such a calculation is straightforward and would not require the State or the courts to speculate as to the propriety of a town's assessment of future tax delinquencies or receipts from nontax revenues.

In contrast, Killington's interpretation of the phrase "municipal budget" in isolation would turn an inflation-protection measure into a device for willing towns to accumulate a surplus of municipal funds at the expense of the statewide education fund. Rather than follow this interpretation simply because it applies a broad and common understanding of the word "budget," we uphold the interpretation arrived at by the administering agency and acknowledged by the

---

[5]The State's calculations demonstrate that the methodologies employed by the Department of Education and the Division of Property Valuation and Review would have resulted in a difference in tax rates of less than one half of one cent.

legislative oversight committee–one that plainly gives effect to the legislative intent behind Act 60 in general and the specific provision at issue here. The State's interpretation satisfies the purpose of the provision to assure that a town's tax rate does not increase by more than forty percent as the result of the new education funding law, but to limit the municipal growth that can be applied in calculating that increase.

*Reversed.*