Dept. of Corrections v. Human Rights Commission (2004-503)

2006 VT 134

[Filed 29-Dec-2006]


 NOTICE: This opinion is subject to motions for reargument under
 V.R.A.P. 40 as well as formal revision before publication in the Vermont
 Reports. Readers are requested to notify the Reporter of Decisions,
 Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of
 any errors in order that corrections may be made before this opinion goes
 to press.


 2006 VT 134

 No. 2004-503


 Department of Corrections Supreme Court

 On Appeal from
 v. Washington Superior Court


 Human Rights Commission October Term, 2005


 Alan W. Cook, J.

 William H. Sorrell, Attorney General, Montpelier, and Marie J. Salem and
 Kate Duffy, Assistant Attorneys General, Waterbury, for
 Petitioner-Appellant.

 Robert Appel, Executive Director, Montpelier, for Respondent-Appellee.

 John Boldosser IV and Barbara Prine, Vermont Legal Aid, Burlington, for
 Intervenor-Appellee.


 PRESENT: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 
 ¶ 1. JOHNSON, J. The issue in this appeal is whether the Vermont
 Fair Housing and Public Accommodations Act, 9 V.S.A. §§ 4500-4507, applies
 to state correctional facilities, thereby giving the Human Rights
 Commission jurisdiction to investigate complaints filed by state prisoners
 alleging violations of the Act. Based upon its determination that the Act
 covers state prisons, the superior court denied the Department of
 Corrections' motion to quash a subpoena served by the Commission in
 conjunction with a prisoner's discrimination claim. The Department
 contends that the court erred insofar as prisons do not offer services or
 benefits to the "general public" and thus are not "places of public
 accommodation" subject to the Commission's investigatory powers. We
 conclude that the Legislature intended to make all governmental entities,
 including state prisons, subject to the Act. Accordingly, we affirm the
 superior court's decision.

 ¶ 2. On appeal, the Department relies primarily on a single phrase
 in one statutory definition to support its argument that state prisons are
 not covered by the public accommodations statute. Nothing in the language
 or history of the statute, however, indicates that the Legislature intended
 the law to cover some governmental entities, but not others, depending on
 whether, or how directly, they offer services or benefits to the general
 public. The phrase "general public" within the statutory definition of a
 "place of public accommodation" is a holdover from the original 1957
 statute, which, like similar laws in other jurisdictions, was aimed at
 assuring that private establishments catering to members of the general
 public did not discriminate on the basis of race or other specified
 criteria. Hence, a "place of public accommodation" was defined as an
 establishment that provided benefits or services to the general public. 
 The critical inquiry, then, in determining which private entities were
 covered by the law was whether a particular establishment served the
 general public. That question makes little sense, however, when applied to
 public or governmental entities, which are created for the very purpose of
 serving the general public.
 
 ¶ 3. The most reasonable interpretation of the statute,
 particularly considering that it must be liberally construed to effectuate
 its remedial purpose, is that the Legislature intended to make all
 governmental entities, in addition to all private entities offering
 services or benefits to the general public, subject to the Act's
 anti-discrimination provisions. There is support for this interpretation
 not only in the statutory language, but also in the history of the
 statutory amendments and the legislative policy underlying the Act. In
 particular, the legislative history of the 1992 amendment unequivocally
 confirms that the Act was intended to apply to all governmental entities
 and to provide a local enforcement mechanism for claims actionable under
 the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12300, which
 applies to all public entities, including state prisons.

 ¶ 4. The Human Rights Commission has jurisdiction to investigate and
 enforce complaints of unlawful discrimination in public accommodations. 9
 V.S.A. § 4552(b). Pertinent to this case, it is generally unlawful for any
 place of public accommodation to discriminate against an individual with a
 disability. Id. § 4502(c). The Commission may accept complaints that
 state a prima facie case of discrimination, and must dismiss those that do
 not. Id. § 4554(a)-(b). In conducting an investigation, the Commission
 can issue subpoenas with respect to complaints filed under § 4554 where
 there is reasonable cause to believe that the materials or testimony
 requested are material to the complaint. Id. § 4553(a)(5).

 ¶ 5. In November 2003, the Commission served a subpoena on the
 Department in connection with a discrimination charge filed on behalf of a
 state prisoner. The prisoner complained that the Department's correctional
 facility discriminated against him on the basis of his disability. The
 Department moved the Commission to quash the subpoena under § 4553(a)(5),
 asserting that the complaint failed to state a prima facie case of
 discrimination because a correctional facility was not a "place of public
 accommodation" under the Act. The Commission denied the Department's
 request in December 2003.
 
 ¶ 6. The Department then moved to quash the subpoena in superior
 court. In September 2004, following a hearing, the court denied the
 Department's motion and granted the Commission's motion to enforce the
 subpoena. Relying on Pennsylvania Department of Corrections v. Yeskey, 524
 U.S. 206 (1998), the court concluded that Vermont's correctional facilities
 plainly offered "services, facilities, goods, privileges, advantages,
 benefits or accommodations" to prisoners and thus was a "place of public
 accommodation." See 9 V.S.A.§ 4501(1). According to the court,
 irrespective of whether the physical structures of government buildings,
 including prisons, are open to the public, state prisons are essentially
 public places open to any member of the general public unfortunate enough
 to meet the criteria for obtaining their services. The court granted the
 Department's request for a stay, and this appeal followed.

 ¶ 7. On appeal, the Department argues that the Human Rights
 Commission did not have jurisdiction to issue its subpoena in this case
 because correctional facilities do not serve or benefit the general public
 and thus are not "places of public accommodation" under the Act. This is a
 case of statutory interpretation in which our review of the trial court's
 decision is nondeferential and plenary. Human Rights Comm'n v. Benevolent
 & Protective Order of Elks, 2003 VT 104, ¶ 13, 176 Vt. 125, 839 A.2d 576. 
 "Our paramount goal, when interpreting a statute, is to effectuate the
 intent of the Legislature." Id. As we stated in Order of Elks, a recent
 case interpreting the Act, we effectuate legislative intent by looking "to
 the statute's language and any legislative history, as well as the
 legislative policy the statute was designed to implement." Id. We also
 stressed in Order of Elks that, as a remedial statute, the Act "must be
 liberally construed in order to 'suppress the evil and advance the remedy'
 intended by the Legislature." Id. (quoting 3 N. Singer, Statutes and
 Statutory Construction § 60:1, at 183 (6th ed. 2001)).
 
 ¶ 8. To interpret the Legislature's intent, we begin by examining
 the statutory language. Russell v. Armitage, 166 Vt. 392, 403, 697 A.2d
 630, 637 (1997). Our public accommodations statute forbids owners or
 operators of places of public accommodation from discriminating on the
 basis of specified criteria. 9 V.S.A. § 4502. "Public Accommodation" is
 defined as "an individual, organization, governmental or other entity that
 owns, leases, leases to or operates a place of public accommodation." Id.
 § 4501(8). "Place of public accommodation," in turn, is defined as "any
 school, restaurant, store, establishment or other facility at which
 services, facilities, goods, privileges, advantages, benefits or
 accommodations are offered to the general public." Id. § 4501(1). The
 interpretive problem arises because the definition of "place of public
 accommodation" retains the term "general public," which historically was
 used to determine which private entities were subject to the law, while the
 relatively recent definition of "public accommodation" does not necessarily
 restrict governmental entities to the criteria set forth in the definition
 of "place of public accommodation."

 ¶ 9. The statute also has a legislative intent section that was
 added in 1992 to ensure that the Public Accommodations Act would be applied
 consistently with the then recently enacted federal Americans with
 Disabilities Act, 42 U.S.C. §§ 12101-12300. That section states:

 (a) The provisions of this chapter establishing legal standards,
 duties and requirements with respect to persons with disabilities
 in places of public accommodation as defined herein, except those
 provisions relating to remedies, are intended to implement and to
 be construed so as to be consistent with the Americans with
 Disabilities Act, 42 U.S.C. § 12101 et seq. and rules adopted
 thereunder, and are not intended to impose additional or higher
 standards, duties or requirements than that act.

 (b) Subsections 4502(b) and (c) of Title 9 shall not be construed
 to create or impose on governmental entities additional or higher
 standards, duties, or requirements than that imposed by Title II
 of the Americans with Disabilities Act.

 9 V.S.A. § 4500.
 
 ¶ 10. It is undisputed that prisoners may pursue discrimination
 claims under Title II of the ADA, 42 U.S.C. §§ 12131-12134. See, e.g.,
 Charbonneau v. Gorczyk, 2003 VT 105, ¶ 8, 176 Vt. 140, 838 A.2d 117
 (reviewing state prisoner's discrimination claim against commissioner of
 Department of Corrections, and noting that the ADA "prohibits state
 agencies like the DOC from excluding an individual from a DOC program
 because of the individual's disability"). Indeed, in a unanimous opinion,
 the United States Supreme Court has held that Title II of the ADA
 "unmistakably includes State prisons and prisoners within its coverage." 
 Yeskey, 524 U.S. at 209. Hence, the real issue in this case is whether
 prisoners can use the local enforcement provisions of the Public
 Accommodations Act to raise claims actionable under the ADA. This point is
 significant because, as discussed below, the legislative history reveals
 that the 1992 amendment was intended not only to make it explicit that
 government entities are covered by the Public Accommodations Act, but also
 to allow persons with claims under the ADA to bring those claims within the
 local enforcement scheme provided in the Act.

 ¶ 11. The ADA has two distinct subchapters that deal with, on the
 one hand, public entities, and on the other, private entities serving the
 public. Subchapter II, entitled "Public Services," prohibits a "public
 entity," including any agency or department of a local or state government,
 42 U.S.C. § 12131, from denying benefits or services to any qualified
 individual. Id. § 12132. Subchapter III, entitled "Public Accommodations
 and Services Operated by Private Entities," prohibits private entities that
 are considered places of public accommodation from discriminating on the
 basis of disability with respect to the services or benefits they offer. 
 Id. §§ 12181(7), 12182. Thus, the ADA covers all public (i.e.
 governmental) entities and all private entities serving the public.
 
 ¶ 12. Although the 1992 amendment did not adopt the bifurcated
 format contained in the ADA, the legislative history demonstrates that the
 amendment was intended to: (1) make it explicit that the public
 accommodations law applies to governmental entities; (2) integrate the
 duties and requirements of the ADA into the public accommodations law so
 that covered entities would not be subjected to varying standards under
 federal and state law; and (3) create a local enforcement mechanism under
 the public accommodations law for complaints otherwise actionable under the
 ADA. With respect to the first objective, the Legislature added within the
 definition section of the statute the term "public accommodation," which it
 defined as "an individual, organization, governmental or other entity that
 owns, leases, leases to or operates a place of public accommodation." 
 1991, No. 243 (Adj. Sess.), § 1 (emphasis added). The Legislature also
 expanded the definition of "place of public accommodation," but retained
 the term "general public." Id. (amending definition of "place of public
 accommodation" from "any school, restaurant, store or other establishment
 which caters or offers its services or facilities or goods to the general
 public" to "any school, restaurant, store, establishment or other facility
 at which services, facilities, goods, privileges, advantages, benefits, or
 accommodations are offered to the general public"). With respect to the
 second objective, the Legislature added the legislative intent provision
 set forth above. Id. § 5.
 
 ¶ 13. Thus, the critical statutory language concerning the present
 dispute-including the definition of "public accommodation" that referred
 for the first time to governmental entities-was inserted as part of the
 1992 amendment that came about, in large part, as a response to the
 enactment of the ADA. The chief proponent of the bill (Senate Bill 403)
 was the Vermont Coalition for Disability Rights (VCDR), with the full
 support of, and input from, the Human Rights Commission. At hearings
 before both the Senate Judiciary and General Housing and Military Affairs
 Committees, a representative of the VCDR and the executive director of the
 Commission provided extensive testimony on the meaning and purpose of the
 amendments. Much of the relevant testimony took place at a March 5, 1992
 hearing before the Senate General Housing and Military Affairs Committee.

 ¶ 14. Referring to the newly inserted definition of public
 accommodation, which expressly included governmental entities, the VCDR
 representative stated that the words governmental entity were included in
 the definition at the suggestion of the Commission to make it explicit that
 the public accommodations law applied to government agencies. She told the
 committee that VCDR was not "asking the public entities to do anything that
 they are not already required to do under the ADA." She further stated
 that one of the main purposes of the bill was to put the ADA into Vermont
 law so that the Commission would be "available and able to investigate
 complaints of discrimination by public accommodations." In that way, "we
 would have a local, fairly quick way of resolving complaints," which would
 benefit both sides. 

 ¶ 15. The executive director of the Commission reiterated these
 points in her testimony. In addition to stressing the need for local
 enforcement so that parties would not be relegated to a vague federal
 enforcement scheme, she stated as follows:

 The other thing that this bill does is it makes it clear that
 governmental entities are considered a place of public
 accommodation. That also has been unclear in the current law. We
 have been interpreting the current law to include government
 entities because the definition of a place of public accommodation
 in current law is very broad. . . . Many other states specifically
 include governmental entities as a place of public accommodation. 
 And we think that our general definition would cover it, but this
 bill would make that clearer as well.

 When one of the committee members asked her if the new definition of public
 accommodation was in the ADA, the executive director responded by
 explaining that the ADA had separate subchapters dealing with public
 entities (Subchapter II) and with private places of public accommodation
 (Subchapter III), but that the term "public accommodation" was used only in
 Subchapter III. She stated that rather than follow this more complicated
 format, they had "telescoped" the provisions into one bill.

 ¶ 16. Several other witnesses from all sides expressed support for
 the amendment and recognized its main purposes of clarifying the standards
 and obligations of the law and providing a local enforcement mechanism for
 the ADA. A representative of the Department of Aging and Disabilities
 acknowledged that the bill would ensure enforcement of public access at the
 local level and stated that "[a]dding state government to the provisions of
 the public accommodations bill will not be an issue, in my opinion, that
 will present an undue burden [on] . . . state government." He opined that
 the amendment would benefit all concerned, including businesses and state
 government, by allowing the parties to work out complaints promptly and
 locally through the Commission. Witnesses representing business interests
 were also supportive of the bill, their main concern being that they would
 not be subject to differing state and federal standards.
 
 ¶ 17. A representative of the Vermont League of Cities and Towns
 (VLCT) also expressed support for the bill, but wanted the public
 accommodations law to expressly state that government entities would be
 subject to standards and obligations set forth in Subchapter II of the ADA,
 as opposed to Subchapter III dealing with private entities. When one
 committee member asked her what was confusing about the bill as written,
 she stated that "you are throwing everybody into the same pot." Her
 concerns resulted in adding an apparently redundant second subsection to
 the legislative intent provision included in the bill. The first
 subsection of that provision, upon which the dissent relies, states that
 the provisions establishing standards, duties, and requirements with
 respect to persons with disabilities "in places of public accommodation as
 defined herein" are intended to implement and be construed as consistent
 with the ADA. 9 V.S.A. § 4500(a). According to the VLCT representative,
 however, the quoted phrase was put there to make it clear that the
 legislative intent section applied only to the public accommodations
 provisions and not the fair housing provisions contained in the same
 chapter. Thus, the phrase was not intended to restrict the scope of the
 public accommodations law, as the dissent suggests.

 ¶ 18. The testimony of these witnesses, and their discussions with
 committee members, demonstrate that the 1992 amendment to the Public
 Accommodations Act was intended to make it explicit that governmental
 entities are places of public accommodation, consistent with the ADA. 
 Rather than adopt the bifurcated structure of the ADA in which all public
 entities are subject to the anti-discrimination law under Subchapter II,
 and other places of public accommodations (i.e. private enterprises that
 cater to the public) are subject to the law under Subchapter III, the
 Legislature simply incorporated governmental entities into a newly added
 definition of "public accommodation" with the expectation that the law
 would apply to them in general.
 
 ¶ 19. "We have frequently relied upon legislative history where
 the meaning of the statute cannot be determined from the words alone." In
 re Dep't of Bldgs. & Gen. Servs., 2003 VT 92, ¶ 14, 176 Vt. 41, 838 A.2d
 78. Although the remarks of a single witness at a committee hearing are
 generally given little weight in determining legislative intent, id., we
 have relied upon committee testimony and legislators' discussions when they
 convincingly reveal the intent underlying a statute. See, e.g., In re
 Hinsdale Farm, 2004 VT 72, ¶ 17, 177 Vt. 115, 858 A.2d 249 (citing
 committee testimony that convincingly illustrated legislative intent). 
 Here, it is appropriate to rely on the legislative history to help us
 understand the legislative intent underlying the Public Accommodations Act,
 as it has been amended over the years..

 ¶ 20. Construing the Public Accommodations Act to apply to all
 governmental entities also makes sense in light of the underlying policy
 and evolution of the law. As noted, Vermont's statute dates back to 1957. 
 Order of Elks, 2003 VT 104, ¶ 15. As with other state statutes, the
 primary target of Vermont's statute was private businesses that catered to
 the general public. (FN1) See Lerman & Sanderson, supra note 1, at 218
 ("Proscription of discrimination in public accommodations is premised on
 the notion that many privately-owned establishments are to some extent
 public."). The statute, which consisted of three sentences, prohibited
 "[a]n owner or operator of a place of public accommodation" from
 discriminating based on race, creed, color or national origin by denying
 any person "any of the accommodations, advantages, facilities and
 privileges of such place of public accommodation." 1957, No. 109, § 1. A
 place of public accommodation was defined as "any establishment which
 caters or offers its services or facilities or goods to the general
 public." Id.
 
 ¶ 21. In the ensuing decades, the Legislature enacted several
 amendments that, as with public accommodation statutes in other states,
 "broadened [the statute's] scope with regard to the groups protected from
 discrimination under the statute and the establishments or facilities
 covered by definition." Order of Elks, 2003 VT 104, ¶ 15; see Roberts v.
 U.S. Jaycees, 468 U.S. 609, 624 (1984) (noting that many states have
 "progressively broadened the scope of [their] public accommodations law . .
 . both with respect to the number and type of covered facilities and with
 respect to the groups against whom discrimination is forbidden"). As
 discussed above, the statute was amended in 1992, in part, to clarify that
 government entities are covered by the statute. Retention of the term
 "general public," which had been part of the statutory language since the
 law's inception in 1957, does not suggest that the Legislature intended to
 distinguish between government entities depending on the degree of contact
 with the general public. 


 ¶ 22. Nevertheless, like the Department, the dissent relies almost
 exclusively on dictionary definitions of the words "general" and "public"
 in concluding that prisons do not offer benefits or services to the general
 public and thus are not subject to the anti-discrimination provisions of
 our public accommodations law. (FN2) For the reasons set forth above, we
 decline to construe the statute so narrowly. While we are generally
 restricted to the commonly understood meaning of "absolutely clear and
 unambiguous" statutory language, "if any question remains as to the intent
 underlying the statute, we also look at 'the legislative history and
 circumstances surrounding its enactment, and the legislative policy it was
 designed to implement.' " In re McIntyre Fuels, Inc., 2003 VT 59, ¶ 7, 175
 Vt. 613, 833 A.2d 829 (mem.) (quoting Perry v. Med. Practice Bd., 169 Vt.
 399, 406, 737 A.2d 900, 905 (1999)); see Town of Killington v. State, 172
 Vt. 182, 189, 776 A.2d 395, 401 (2001) ("When the plain meaning of
 statutory language appears to undermine the purpose of the statute, we are
 not confined to a literal interpretation, but rather must look to the broad
 subject matter of the statute, its effects and consequences, and the
 purpose and spirit of the law to determine legislative intent.").
 
 ¶ 23. In light of the evolving scope of public accommodations law,
 the complicated history of our statute, and its arguably redundant
 provisions, the statutory language is not so clear that we can rely
 exclusively on the commonly understood meaning of two isolated words to
 determine the Legislature's intent. Cf. Dep't of Bldgs. & Gen. Servs.,
 2003 VT 92, ¶ 13 (refusing to join the environmental court in concluding
 that the meaning of the statutory language was so plain that no aids of
 statutory construction should be employed); Town of Killington, 172 Vt. at
 189-90, 776 A.2d at 401 (declining to accept the most commonly understood
 meaning of the general term "municipal budget" in the context of the
 specific statute, but instead liberally construing the statute to
 effectuate its remedial purpose and the intent of the Legislature). As
 noted above, the definition of a "place of public accommodation" is more
 useful for determining jurisdiction over private entities than it is for
 determining which governmental entities are public. Government is public.

 ¶ 24. The plain-meaning rule cannot be used to thwart judicial
 inquiry into the legislative intent behind statutory language that may
 initially appear plain upon a superficial examination. 2A N. Singer,
 Sutherland Statutory Construction § 48.01, at 302 (5th ed. 1992). 
 Moreover, we would not be liberally construing the public accommodations
 law to implement its remedial purpose by holding that the retention of the
 phrase "general public" from the original statute demonstrates a
 legislative intent to distinguish between public entities that do and do
 not serve the general public. See Lerman & Sanderson, supra note 1, at
 242-43 (noting that statutes such as those in New Mexico, Oregon, and
 Vermont that use broad definitions of places of public accommodation "are
 assumed to cover places offering food and drink, lodgings and
 entertainment, as well as retail establishments and state facilities"
 (emphasis added)).
 
 ¶ 25. In short, the general scheme of the public accommodations
 statute, viewed in light of its underlying purpose and history,
 demonstrates that the Legislature intended to make all governmental
 entities subject to the public accommodations law. The dissent asserts
 that "there is nothing unclear or unreasonable about the Legislature
 distinguishing state prisons from other governmental entities." Post, ¶
 33. That is a debatable, but ultimately irrelevant, point, given that the
 Legislature has not exempted state prisons-or any other public entity for
 that matter-from a law that was intended to apply to governmental entities
 in general.

 Affirmed.


 FOR THE COURT:


 _______________________________________
 Associate Justice


------------------------------------------------------------------------------
 Dissenting

 ¶ 26. BURGESS, J., dissenting. Constrained to read and apply what
 the Legislature enacted, rather than what the majority believes the
 Legislature meant to say, I respectfully dissent. We might frequently
 perceive an arguably better policy or reason to extend legislation beyond
 what is actually declared by the statute. It is not the function of this
 Court, however, to correct or change a statute that can otherwise
 effectively achieve a purpose plainly and unambiguously written by the
 Legislature. 

 ¶ 27. We are asked to decide if a state correctional facility is a
 "place of public accommodation" under the Vermont Fair Housing and Public
 Accommodations Act, 9 V.S.A. §§ 4500-4507, and, consequently, whether the
 Human Rights Commission has jurisdiction to investigate prisoner complaints
 of disability discrimination.(FN3) The statute defines a "place of public
 accommodation" to mean: 

 any school, restaurant, store, establishment or other facility at
 which services, facilities, goods, privileges, advantages,
 benefits or accommodations are offered to the general public.

 9 V.S.A. § 4501(1). Prisons do not offer "services, facilities . . . or
 accommodations . . . to the general public," and so are not places of
 public accommodation as defined by the statute.

 ¶ 28. In interpreting a statute, our goal is to implement
 legislative intent. Herrick v. Town of Marlboro, 173 Vt. 170, 173, 789
 A.2d 915, 917 (2001). "The definitive source of legislative intent is the
 statutory language, by which we are bound unless it is uncertain or
 unclear." In re Bennington Sch., Inc., 2004 VT 6, ¶ 12, 176 Vt. 584, 845
 A.2d 332. We presume that the Legislature intended the plain ordinary
 meaning of the language that it used, Brennan v. Town of Colchester, 169
 Vt. 175, 177, 730 A.2d 601, 603 (1999), and when the meaning of a statute
 is plain, it must be enforced according to its terms. In re Middlebury
 Coll. Sales and Use Tax, 137 Vt. 28, 31, 400 A.2d 965, 967 (1979). 
 Remedial legislation, such as the 1992 amendment, should be liberally
 construed, Human Rights Comm'n v. Benevolent and Protective Order of Elks,
 2003 VT 104, ¶ 13, 176 Vt. 125, 839 A.2d 576, but "liberal construction
 does not allow us to stretch the language beyond legislative intent." 
 Elkins v. Microsoft Corp., 174 Vt. 328, 331, 817 A.2d 9, 13 (2002). 
 
 ¶ 29. Applying the language used, the Act is unambiguous. While
 prisons may provide services and accommodations to prisoners, prisoners are
 not "the general public" as that term is commonly understood. Black's Law
 Dictionary defines "general" as relating "to the whole kind, class, or
 order" and "open or available to all, as opposed to select." Black's Law
 Dictionary 614 (5th ed. 1979); see also Webster's Ninth New Collegiate
 Dictionary 510 (1985) (defining "general" as "involving, applicable to, or
 affecting the whole"). "Public" is defined as "[t]he whole body politic,
 or the aggregate of the citizens of a state, nation, or municipality." 
 Black's Law Dictionary 1104 (5th ed. 1979); see also Webster's Ninth New
 Collegiate Dictionary 952 (1985) (defining "public" as "the people as a
 whole: populace"). The plain and ordinary meaning of the phrase "the
 general public," in both common and legal parlance, is the whole community
 at large. (FN4) 
 
 ¶ 30. I am not persuaded, as is the majority, that the
 explicitly-defining phrase "to the general public" is a vestigial
 anachronism, a sort of statutory coccyx, that the Legislature intended to
 obviate through its 1992 expansion of "public accommodation" to include
 governmental facilities. We should presume, instead, that the Legislature
 intended to keep the preexisting definition in place as, indeed, it did
 here. See Robes v. Town of Hartford, 161 Vt. 187, 193, 636 A.2d 342, 347
 (1993) (in considering statutory language, "we presume that the
 [L]egislature chose its words advisedly"). We should also presume that the
 Legislature appreciated the effect of its statutory definition on the newer
 legislation. Scott v. St. Johnsbury Acad., 86 Vt. 172, 175, 84 A. 567, 568
 (1912) ("It is to be presumed that in enacting [an amendment] the
 Legislature acted with full knowledge of the prior legislation on the
 subject . . . ."). While these canons of statutory construction need not
 be slavishly followed to an ineffective or unreasonable result, see Audette
 v. Greer, 134 Vt. 300, 302, 360 A.2d 66, 68 (1976) (observing that "it is
 essential that the [statutory] construction not be such that will render
 the act ineffective or lead to irrational consequences"), no such result
 obtains here, since all state governmental operations that do offer
 services to the general public are subject to the coverage plainly intended
 by the 1992 amendment. 

 ¶ 31. The majority correctly points out that in the 1992 amendments
 the Legislature said that the Act's provisions concerning "legal standards,
 duties and requirements" were to be construed consistently with the ADA. 
 Just as explicitly, however, the same declaration of "legislative intent"
 specifies that the Act is to apply to "places of public accommodation as
 defined herein," 9 V.S.A. § 4500(a) (emphasis added), rather than as
 defined by the ADA. That the Legislature intended its definition of
 "public accommodation,"and not that set forth in the ADA, to govern this
 particular element is clear from its revision of that very definition as
 part of the same 1992 amendment, which nevertheless maintained the
 statute's reach to facilities open to or serving "the general public."
 1991, No. 243 (Adj. Sess.), § 1. (FN5)
 
 ¶ 32. The majority's reference to Title II and Title III of the
 Americans with Disabilities Act shows only that 9 V.S.A. § 4501(1) defines
 "public accommodation" more narrowly than "public entity" in the ADA. Had
 the Legislature intended the Act to apply to all "public entities," as
 under Title II of the ADA, it could have said so. The Legislature could
 have adopted the definition of "public accommodation" found in Title III of
 the ADA, 42 U.S.C. § 12181(7), but it did not do so. 

 ¶ 33. There is nothing unclear or unreasonable about the Legislature
 distinguishing state prisons from other governmental entities. State
 prisons are, in fact, quite different from many other state governmental
 enterprises. (FN6) Unlike departments dealing with commercial regulation,
 motor vehicle registration, public assistance, revenue collection,
 licensing and the like, it is commonly understood that state correctional
 facilities, while public buildings, are neither open nor offer services, to
 the general public. (FN7) It is not irrational for the Legislature to
 obligate both public and private entities to respond to the Commission's
 subpoena power when open to, and serving, the general public. Nor is it
 irrational to exclude prisons from Commission inquiry when prison
 operations, prison policies and prisoners' rights are already subject to
 frequent, if not constant, scrutiny by the Legislature, the Defender
 General's Office, see, e.g., Charbonneau, 2003 VT 105 (Prisoner's Rights
 Office represented inmate in ADA claim against the Department of
 Corrections commissioner), and the courts. 
 
 ¶ 34. Equating the term "public accommodation" as defined in 9
 V.S.A. § 4501(1) with "public entity" as defined in Title II of the ADA and
 applied in Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206,
 209 (1998), is convenient for the majority's theory, but contrary to the
 expressed intent of the Legislature. "Great care should be exercised by
 the court not to expand proper construction of a statute into judicial
 legislation." Harris v. Sherman, 167 Vt. 613, 614, 708 A.2d 1348, 1350
 (1998) (mem.) (quotations and brackets omitted). That the statute could
 have been edited differently to express a different intent does not render
 the statute unclear or ambiguous. "[L]egislative intent is to be
 ascertained from the act itself, which is presumed to be in accordance with
 the ordinary meaning of the statutory language," and "where the statutory
 language is clear and unambiguous in its meaning, as in the present case,
 we will look no further in an effort to determine a contrary legislative
 intent." Cavanaugh v. Abbott Labs., 145 Vt. 516, 530, 496 A.2d 153, 163
 (1985) (quotations omitted); see also In re S. Burlington-Shelburne Highway
 Project, 174 Vt. 604, 605, 817 A.2d 49, 51 (2002) (mem.) ("If the statute
 is unambiguous and the words have plain meaning, we accept and enforce that
 plain meaning as the intent of the Legislature, and our inquiry proceeds no
 further.").

 ¶ 35. Instead, the majority looks to testimony in committee hearings
 to promote its broader construction. This excursion into "legislative
 history," so called, is unnecessary and not particularly reliable. No
 ambiguity compels us to look behind the language of the enactment. In any
 event, committee minutes of statements by partisans, such as the executive
 director for the appellee, for instance, should be a last resort, rather
 than primary source, for statutory construction. Where comments of
 individual legislators are of "little weight" in determining legislative
 intent, State v. Madison, 163 Vt. 360, 373, 658 A.2d 536, 545 (1995), the
 views of lobbyists and advocates must weigh less still, lest one or a few
 purported spokespersons be relied upon, as here, to revise, add or erase a
 word or a phrase on behalf of the entire Legislature. 
 
 ¶ 36. The statute as written does not apply to state correctional
 facilities. The Commission lacked jurisdiction to issue a subpoena to the
 Department. The trial court's statutory construction to the contrary, and
 its denial of the Department's motion to quash, should be reversed. I am
 authorized to state that Chief Justice Reiber joins in this dissent. 



 _______________________________________
 Associate Justice



------------------------------------------------------------------------------
 Footnotes


FN1. Our Public Accommodations Act is a descendent of laws enacted by other
 jurisdictions beginning in the second half of the nineteenth century to
 bolster the common law precluding innkeepers and common carriers from
 refusing to serve any member of the general public. See Hurley v.
 Irish-Am. Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557,
 571 (1995) (describing the common law under which innkeepers and others who
 served the public were prohibited from refusing, without good reason, to
 serve customers). See generally L. Lerman & A. Sanderson, Discrimination
 in Access to Public Places: A Survey of State and Federal Public
 Accommodations Laws, 7 N.Y.U. Rev. L. & Soc. Change 215, 218, 238-40, 242
 (1978) (discussing the history of state public accommodations statutes and
 noting that early statutes were considered restatements of the obligation
 of innkeepers and common carriers to admit all travelers); J. Singer, No
 Right to Exclude: Public Accommodations and Private Property, 90 Nw. U. L.
 Rev. 1283, 1303-13, 1374 (1996) (discussing the scope of early public
 accommodations common law and listing state statutory enactments). 
 Innkeepers and common carriers were considered to be "a sort of public
 servants," Hurley, 515 U.S. at 571 (quoting Rex v. Ivens, 7 Car. & P. 213,
 219, 173 Eng. Rep. 94, 96 (N.P. 1835)), because they engage in "public
 employment" or "a trade which is for the public good." See Singer, supra,
 at 1305-06, 1312-13, 1327-30.

FN2. Even assuming that the Legislature did intend somehow to distinguish
 between governmental entities that do and do not serve the general public,
 one could make a strong argument that prisons should be considered an
 institution that serves the general public. As the United States Supreme
 Court acknowledged in a unanimous opinion construing the ADA, "[s]tate
 prisons fall squarely within the statutory definition of 'public entity,' "
 and they plainly provide benefits and services to prisoners. Yeskey, 524
 U.S. at 210. Prisoners are members of the general public, and any member
 of the general public who commits a crime may be incarcerated and subjected
 to the benefits and services of the prison system. State prisons, like
 many hospitals or even schools, are places where people do not necessarily
 want to go, but any member of the public meeting certain criteria may be
 "invited"-and is entitled-to participate in their programs and receive
 their benefits. See Chisolm v. Manimon, 97 F. Supp. 2d 615, 621-22 (D.N.J.
 2000) (finding jails to be analogous to hospitals with respect to the state
 public accommodations law and predicting that the New Jersey Supreme Court
 would find jails and prisons to be places of public accommodation); cf.
 Neal v Mich. Dep't of Corr., 592 N.W.2d 370, 373-74 (Mich. Ct. App. 1998)
 (holding that state correctional facilities are places of "public service"
 subject to the state civil rights act). But see Skaff v. W. Va. Human
 Rights Comm'n, 444 S.E.2d 39, 41-42 (W. Va. 1994) (holding that penal
 institutions are not places of public accommodation under state law because
 incarcerated individuals are not members of the general public).

 Moreover, apart from the direct benefits and services to prisoners,
 state prisons benefit and serve the general public by protecting members of
 the general public from dangerous individuals. State prisons do this both
 by physically incarcerating and by rehabilitating those individuals. As
 stated in 28 V.S.A. § 1(a), the purpose of the Department of Corrections is
 to administer a program "designed to protect persons . . . against
 offenders . . . and to render treatment to offenders with the goal of
 achieving their successful return and participation as citizens of the
 state and community, to foster their human dignity and to preserve the
 human resources of the community." The Department is required to develop a
 program that, among other things, "will establish as its primary objective
 the disciplined preparation of offenders for their responsible roles in the
 open community." Id. § 1(b). To achieve these goals, the department is
 directed to utilize, among other things, "the increased participation of
 the citizens of the state." Id. § 1(c). It would be difficult to conceive
 of purposes better illustrating that prisons are governmental entities
 serving and providing benefits to the general public.

FN3. No one disputes that prisoners can pursue discrimination claims under
 Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134
 (2006). See, e.g., Charbonneau v. Gorczyk, 2003 VT 105, ¶ 8, 176 Vt.
 140, 838 A.2d 117 (acknowledging that prisoner's disability discrimination
 complaint against Commissioner of Corrections was governed by Title II).

FN4. Individuals or a group of persons incarcerated in a state jail
 facility, although taken from the population at large due to their
 distinguishing behavioral characteristics, are not "the general public" in
 the ordinary sense of those words. This is not an academic result based on
 dictionary definitions, as suggested by the majority, but is reality. The
 Legislature elsewhere acknowledges this reality by noting that most
 institutionalized offenders "ultimately return to the community" and by
 directing the Department to prepare inmates "for their responsible roles in
 the open community." 28 V.S.A. § 1(b).

FN5. If, as contended by the majority, this expression was inadvertent, the
 Legislature may always revisit and revise its legislation.

FN6. Vermont would not have been unique in making this distinction. 
 Construing a comparable statute, the West Virginia Supreme Court of Appeals
 similarly concluded that state prisons are not "places of public
 accommodations" for prisoners so that prisoner claims of discrimination did
 not fall within the jurisdiction of the state Human Rights Commission. 
 Skaff v. W. Va. Human Rights Comm'n, 444 S.E.2d 39, 42 (W. Va. 1994). The
 court found it apparent that prisoners were not "members of the general
 public." Id. at 41. In Blizzard v. Floyd, 613 A.2d 619, 620-21 (Pa.
 Commw. Ct. 1992), the court considered the statutory definition of "public
 accommodation," defined in relevant part, as "any accommodation, resort or
 amusement which is open to, accepts or solicits the patronage of the
 general public," and concluded that state correctional facilities were not
 public accommodations because they did not "accept or solicit the patronage
 of the general public." 

FN7. There may, however, be parts of facilities, such as parking lots,
 lobbies and visiting rooms, that fall within the definition of "public
 accommodation" because they are actually open to, and do serve, the general
 public.