NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 63

No. 2020-308

| | |
|---|---|
| Human Rights Defense Center | Supreme Court |
| | |
| v. | On Appeal from Superior Court, Washington Unit, Civil Division |
| | |
| Correct Care Solutions, LLC and Correctional Care Solutions Group Holdings, LLC | June Term, 2021 |

Robert R. Bent, J.

Robert Appel, Charlotte, and Daniel Marshall, General Counsel & Litigation Director, Human Rights Defense Center, Lake Worth, Florida, for Plaintiff-Appellant.

Justin B. Barnard of DINSE, Burlington, for Defendants-Appellees.

Lia Ernst and James Diaz, ACLU Foundation of Vermont, Montpelier, for Amici Curiae Secretary of State James Condos, Auditor Doug Hoffer, Prisoners' Rights Office, New England First Amendment Association, and the American Civil Liberties Union of Vermont.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ.

¶ 1. **EATON, J.** Between 2010 and 2015, pursuant to a contract with the Vermont Department of Corrections (DOC), Wellpath LLC[1] assumed responsibility for providing medical care to every person in state custody within Vermont. Under the auspices of Vermont's Public Records Act (PRA), plaintiff Human Rights Defense Center (HRDC) requested from Wellpath any records relating to legal actions and settlements arising from this care. Wellpath declined to furnish the requested records, arguing that, as a private contractor, it was not subject to the PRA's

---

[1] At the time, Wellpath was doing business as Correct Care Solutions, LLC; we adopt the naming convention used in its brief.

disclosure requirements. HRDC brought the instant suit, and the trial court entered judgment for Wellpath. We reverse and remand.

¶ 2. The relevant facts are undisputed. Wellpath is a private company which contracts with government agencies in multiple states to provide medical care in prisons and jails. In 2009, the Vermont DOC sought bids from medical contractors capable of "operating a comprehensive health[]care program" for incarcerated individuals "on behalf of the State." The DOC selected Wellpath's bid, and the two entities entered a contract for such services beginning in 2010.

¶ 3. During the five-year period that the contract was in place, Wellpath was responsible for delivering or procuring all medical care necessary for persons incarcerated in the DOC's facilities. This comprehensive range of services encompassed, inter alia, medical assessments, primary care, infirmary services, dental care, dietary management, obstetrics and gynecology, prosthetics, optometry, substance-abuse treatment, chronic-disease management, and provision of mental-health services. In exchange for assuming these responsibilities, the DOC paid Wellpath more than $91 million over the contract period. At the time, Wellpath's only business in Vermont was pursuant to this contract with the DOC.

¶ 4. Under the contract, Wellpath's policies and procedures were both "subordinate to" those of the DOC and subject to the DOC's review to ensure compliance with relevant federal and state laws and regulations. The DOC was to "monitor[]" Wellpath's ongoing compliance through scheduled and unscheduled audits. The contract contained robust reporting requirements and detailed penalty provisions. For example, Wellpath's failure to administer a routine pharmaceutical within two hours of the time it was scheduled to be dispensed could result in a fine of up to $500 for a single occurrence.

¶ 5. HRDC, the plaintiff in this case, is a nonprofit organization focusing on public education and advocacy related to the criminal-justice system. In December 2015, citing disclosure obligations under the PRA, HRDC sent Wellpath a request for public records relating

2

to claims, lawsuits, or settlements arising from Wellpath's provision of services under its contract with the DOC. Wellpath declined to furnish these documents, taking the position that, as a private entity, it was not subject to the PRA. HRDC sent Wellpath a second records request in December 2017, seeking substantially similar disclosures. Wellpath did not respond.

¶ 6.     HRDC then filed this action in the trial court seeking to compel disclosure under the PRA. The parties filed cross-motions for summary judgment. HRDC argued that, by providing healthcare to inmates on behalf of the state, Wellpath became the "functional equivalent" of a public agency, and was therefore—like the DOC—subject to the PRA. Wellpath countered that the plain language of the PRA neither implicated private entities nor supported application of the functional-equivalency analysis, a test applied in other jurisdictions to determine whether an entity is subject to their public-records acts because its relationship with the government was such that the entity became the "functional equivalent" of a government agency. See, e.g., Washington Research Project, Inc. v. Dep't of Health, Educ. & Welfare, 504 F.2d 238, 245-48 (D.C. Cir. 1974). Thereunder, courts consider four nonexclusive factors: (1) whether, and to what extent, the entity performs a governmental or public function; (2) the level of government funding of the entity; (3) the extent of government involvement with, regulation of, or control over the entity; and (4) whether the entity was created by the government. Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc., 87 S.W.3d 67, 79 (Tenn. 2002). As the Tennessee Supreme Court has explained, because the analysis is intended "to ensure that a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the [public-records act] by contractually delegating its responsibilities to a private entity," the first factor is generally viewed as the "cornerstone" of the test. Id. The trial court applied the functional-equivalency analysis and held that Wellpath was not the functional equivalent of a public agency because the provision of healthcare is not a government function. On this basis, it granted summary judgment for Wellpath.

3

¶ 7. HRDC appeals, maintaining that although the trial court correctly applied the functional-equivalency test to determine whether Wellpath was subject to the PRA, it erred in concluding that Wellpath was not the "functional equivalent" of the DOC thereunder and therefore fell outside the purview of the Act. Wellpath counters that the trial court reached the correct conclusion using the wrong reasoning: the functional-equivalency test is not appropriately applied under the PRA, but nor does the PRA's plain language encompass private entities like Wellpath. We do not reach the question of whether the functional-equivalency test applies to the determination of whether an entity is a "public agency" pursuant to the PRA because it is unnecessary to our conclusion; rather, we find that Wellpath was an "instrumentality" of the DOC during the contract period, and thus a "public agency" subject to the disclosure obligations of the PRA.

¶ 8. We review a trial court's summary-judgment ruling de novo, applying the same standard considered below: judgment is entered in the moving party's favor where it can show that there is no genuine dispute of material fact and judgment is appropriate as a matter of law. Scott v. State, 2021 VT 39, ¶ 11, __ Vt. __, __ A.3d __; see also V.R.C.P. 56(a). The only issue presented in this case is a question of law—whether the term "public agency," as used in the PRA, encompassed Wellpath during the five-year period it contracted with the state. See Northfield Sch. Bd. v. Washington S. Educ. Ass'n, 2019 VT 26, ¶ 13, 210 Vt. 15, 210 A.3d 460 (explaining that issues of statutory interpretation present questions of law).

¶ 9. In interpreting a statute, our primary aim is to discern and then implement the Legislature's intent. Flint v. Dep't of Labor, 2017 VT 89, ¶ 5, 205 Vt. 558, 177 A.3d 1080. We begin by looking to the plain meaning of the words the Legislature used. Id. Where that language is clear and unambiguous, this is also where our inquiry ends: we enforce the enactment according to those terms. Id. Only where the Legislature's intent is unclear on the face of the statute do we resort to other tools of statutory construction. Id.

4

¶ 10.  Accordingly, we turn first to the operative language of the Act.  Under the PRA, "[a]ny person may inspect or copy any public record of a public agency."  1 V.S.A. § 316(a).  The Act defines "public agency" as "any agency, board, department, commission, committee, branch, instrumentality, or authority of the State or any agency, board, committee, department, branch, instrumentality, commission, or authority of any political subdivision of the State."  Id. § 317(a)(2).

¶ 11.  We are guided in our interpretation of this language by the Legislature's express statement of the policy which undergirds the Act.  See State v. Berard, 2019 VT 65, ¶ 12, n.1, 211 Vt. 39, 220 A.3d 759 (noting that plain language of statute must be considered "in the context and structure of the statute as a whole, rather than in isolation" (quotations omitted)).  In few statutes is the Legislature's intent set forth so explicitly as it is here.  See Caledonian Record Publ'g Co. v. Walton, 154 Vt. 15, 20, 573 A.2d 296, 299 (1990) (commencing interpretation of PRA "with the statement of legislative intent in the Act").  The PRA's policy statement provides that "[o]fficers of government are trustees and servants of the people and it is in the public interest to enable any person to review and criticize their decisions even though such examination may cause inconvenience or embarrassment."  1 V.S.A. § 315(a).  It further directs that the provisions of the PRA "be liberally construed to implement this policy."  Id.

¶ 12.  Moreover, the PRA finds constitutional predicate in Chapter I, Article 6 of the Vermont Constitution, in which the Framers recognized "[t]hat all power being originally inherent in and co[n]sequently derived from the people, therefore, all officers of government . . . are their trustees and servants; and at all times, in a legal way, accountable to them."  Vt. Const. ch. I, art. 6; see also Caledonian Record Publ'g Co., 154 Vt. at 21, 573 A.2d at 299-300 ("The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to." (quoting U.S. Dep't of Justice v. Reporters

5

Comm. for Freedom of the Press, 489 U.S. 749, 772-73 (1989))). Thus, "[w]e do not overstate the case in saying that open access to governmental records is a fundamental precept of our society." Shlansky v. City of Burlington, 2010 VT 90, ¶ 12, 188 Vt. 470, 13 A.3d 1075.

¶ 13. With this understanding of the Legislature's intent, we consider the dispositive question in this appeal: whether Wellpath is a "public agency" within the meaning of the PRA. HRDC contends that this inquiry is appropriately resolved with reference to the functional-equivalency test. However, this Court has yet to consider whether the functional-equivalency analysis has any application under Vermont's PRA, and we do not reach that question today. Courts began applying the functional-equivalency test based on the recognition that "any general definition" of the term "agency" is "of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of the government done." Washington Research Project, Inc., 504 F.2d at 245-46. However, the definition of "agency" set forth in Vermont's PRA is not so general as to have limited utility under the circumstances of this case. We do not consider whether Wellpath was the "functional equivalent" of a public agency because we conclude that it was an "instrumentality" of the DOC during the contract period. See 1 V.S.A. § 317(a)(2). Therefore, it was a "public agency" as that term is defined in the PRA. Id.

¶ 14. Our conclusion that Wellpath was an instrumentality of the DOC is based on the plain meaning of that term, our consideration of all material aspects of the relationship between Wellpath and the DOC, the fundamentally governmental nature of the responsibility Wellpath assumed on behalf of the state, and the liberal construction the Legislature directs us to accord the PRA. Two other jurisdictions, Maryland and New Jersey, have engaged in similar inquiries. Under Maryland's public-records act, a record was subject to disclosure where it was either made or "received . . . in connection with the transaction of public business" "by a unit or instrumentality of the State government or of a political subdivision." Md. Code Ann., State Gov't § 10-611 (2004) (emphasis added). Tasked with determining whether the City of Baltimore Development

Corporation was an "instrumentality" of Baltimore City, the state's highest court identified the following relevant considerations: (1) the plain meaning of the term "instrumentality"; (2) that—consistent with that plain meaning—the entity in question was established and maintained "as an agent or tool of Baltimore City in order to accomplish the City's ends or purposes"; (3) an examination of "all aspects of the relationship between the entity and the state" to determine whether the entity was "subject to substantial control by the City because of how closely the two [were] intertwined"; and (4) the legislature's intent, in passing the state records act, that its constituents "be accorded wide-ranging access to public information concerning the operation of their government." City of Baltimore Dev. Corp. v. Carmel Realty Assocs., 910 A.2d 406, 426-28 (Md. 2006) (quotation omitted).

¶ 15.   Similarly, New Jersey's public-records act applies to "public agencies," a term defined to include an "instrumentality" created by a political subdivision. N.J.S.A. 47:1A-1.1. The Supreme Court of New Jersey has held that a nonprofit lobbying organization representing local government interests was just such an instrumentality. Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities, 25 A.3d 1063, 1071-72 (N.J. 2011). Because "instrumentality" was undefined, the court likewise looked to the dictionary to ascertain its plain meaning. See id. at 1071. It then analyzed multiple facets of the entity's relationship to the state and determined that it was "achieving an end and providing a function on behalf of all [the state's] municipalities," and, as a result, was an "instrumentality" of a political subdivision of the state. Id. (holding that through inclusion of "instrumentality" in definition, plain language of public-records act "places the [entity] squarely within the term 'public agency' "). We apply a similar conceptual framework—looking at all relevant aspects of the relationship between the entity and the state—and arrive at a corollary conclusion.

¶ 16.   We begin by considering the plain meaning of the term "instrumentality." Where, as here, statutory language is undefined, we accord the term its "plain and ordinary meaning, which

may be obtained by resorting to dictionary definitions." <u>Khamnei v. Burlington Pub. Works Comm'n</u>, 2018 VT 19, ¶ 14, 206 Vt. 550, 183 A.3d 1157 (quotation omitted). Black's Law Dictionary indicates that an instrumentality is either "[a] thing used to achieve an end or purpose," or "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body." <u>Instrumentality</u>, Black's Law Dictionary (11th ed. 2019). Similarly, the Merriam-Webster Dictionary tells us that the legal definition of instrumentality is "something through which an end is achieved or occurs" or "something that serves as an intermediary or agent through which one or more functions of a larger controlling entity are carried out," "a part or branch especially of a governing body." <u>Instrumentality</u>, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/instrumentality#learn-more [https://perma.cc/HQE7-V2VU].

¶ 17. It is undisputed here that, between 2010 and 2015, Wellpath was the sole means through which the DOC carried out the function of providing medical care to incarcerated persons. The question of whether this function is fundamentally governmental in nature is important to our analysis for the same reason that courts applying the functional-equivalency test consider it the "cornerstone" of their inquiry: because an interpretation of our public-records act which allows a governmental agency to—intentionally or unintentionally—insulate records relating to the performance of its responsibilities from disclosure by delegating those responsibilities to a private entity would defeat the purpose of the Act. See <u>Memphis Publ'g Co.</u>, 87 S.W.3d at 79 (so concluding in light of duty "to construe the Tennessee Public Records Act liberally in favor of the fullest possible public access to public records" (quotation omitted)); see also, e.g., <u>Trombley v. Bellows Falls Union High Sch. Dist. No. 27</u>, 160 Vt. 101, 108, 624 A.2d 857, 862 (1993) (rejecting reading of PRA exemption which, although "possible," would authorize nondisclosure of documents included in employee's disciplinary file as inconsistent with Legislative mandate to construe PRA liberally in favor of disclosure, noting it would "allow agencies to avoid disclosure

8

by the simple act of placing a document in a personnel or similar file"). Thus, although we do not apply the functional-equivalency test here to determine if Wellpath was the functional equivalent of a public agency, we find that its primary focus on whether the undertaking in question is fundamentally governmental in nature fits hand-in-glove with our inquiry into whether a private entity acted as an "instrumentality" of the state.[2]

¶ 18. Providing medical care to incarcerated persons is a quintessential governmental function. Wellpath argues that healthcare services, being "widely delivered by private medical professionals outside of the correctional context," are "not uniquely governmental in nature." But in focusing on the provision of healthcare generally, rather than the provision of healthcare to incarcerated persons specifically, Wellpath elides the dependent relationship giving rise to the duty in question here. It is precisely the delivery of those services within the correctional context which renders them uniquely governmental in nature. Indeed, the Legislature has required that the DOC "provide health care for inmates in accordance with the prevailing medical standards." 28 V.S.A. § 801(a). And where the DOC contracts with a provider for the delivery of such services, the contract must "establish policies and procedures for continuation and provision of medication at the time of admission and thereafter, as determined by an appropriate evaluation, which will protect the mental and physical health of inmates." Id. § 801(f).

¶ 19. Even more significant to our analysis is our recognition that the provision of healthcare to incarcerated persons is one of those rare instances in which the Constitution imposes upon the government an affirmative duty to care for and protect individuals. DeShaney v. Winnebago Cty. Dept. of Soc. Servs., 489 U.S. 189, 198 (1989). Where the government takes a person into its custody, the Eighth Amendment obligates it to provide medical care for that person.

---

[2] Indeed, because determining whether an entity is an instrumentality requires an examination of all relevant aspects of its relationship to the state, the factors considered as part of the functional-equivalency test, although not independently dispositive, may be considered as part of the instrumentality analysis.

Estelle v. Gamble, 429 U.S. 97, 103-04 (1976) (identifying as basis for this holding long-recognized "common-law view that it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself" (alteration omitted) (quotation omitted)). Deliberate indifference to an incarcerated person's "serious medical needs" is proscribed, and "[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104-05 (footnotes omitted). Thus, courts recognize that "[w]hen a private entity . . . contracts with a [government entity] to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state." Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997) (per curiam).

¶ 20. Finally, the contract language belies Wellpath's assertion that it cannot be considered an "instrumentality" because it did not exercise the authority of the state to administer government policy. The DOC crafted, in minute detail, policies governing when, whether, and how Wellpath was to deliver services to persons in custody. Wellpath necessarily exercised the authority of the state in administering these policies on the DOC's behalf. Indeed, absent such authority, it is impossible to imagine how Wellpath could have provided care within facilities owned and operated by the DOC to persons in the DOC's exclusive custody.

¶ 21. Thus, we conclude that the language of the PRA is unambiguous: where the state contracts with a private entity to discharge the entirety of a fundamental and uniquely governmental obligation owed to its citizens, that entity acts as an "instrumentality" of the State.[3]

_____

[3] Because we conclude that the relevant statutory language is unambiguous, we need not address Wellpath's contention that two canons of construction auger in favor of the conclusion that public entities are not encompassed within the PRA's definition of "public agency." See Flint, 2017 VT 89, ¶ 5. However, because these arguments may be briefly dispatched, we pause here to do so. Wellpath first points to the exemption to the PRA's disclosure requirements at 1 V.S.A. § 317(c)(42), which applies to information which could be used to identify a whistleblower alleging misconduct or illegality on the part of "a public agency, a public employee or official, or

10

Where the obligation at hand is less weighty, and the delegation less complete, a different result may lie. But because here, for five years, Wellpath was the sole means through which the constitutional imperative that the DOC provide healthcare to those it incarcerates was carried out, Wellpath became an "instrumentality" of the state, and was thus subject to the disclosure obligations of the PRA.

¶ 22. Wellpath also argues that construing the PRA to extend to entities like itself is the role of the Legislature, and not the Court, because it would necessitate changes throughout the Act "to adapt and rationalize its procedures and clarify their application to private parties." It proffers several incongruencies which result from construing "instrumentality" to include Wellpath: the Act indicates that the fee for obtaining a copy of a public record be set by the Secretary of State as to state agencies, and by the governing legislative body after public hearing for political subdivisions, but includes no such requirement for private entities, see 1 V.S.A. § 316(d), (e); the Act provides for appeal to "the head of the agency," see id. § 318(c)(1); the record schedules pursuant to which entities may discard records offer no guidance to private entities, see id. § 317a(b); and, finally, the PRA does not include provisions requiring that public entities receive

<hr>

a person providing goods or services to a public agency under contract." (emphasis added). It argues that if "persons or entities" or "companies" providing goods or services to an agency under contract were included in the definition of "public agency," the latter portion of § 317(c)(42) would be unnecessary. Although it is true that we presume, in interpreting statutes, that the Legislature inserts language advisedly and does not intend to create surplusage, see Doncaster v. Hane, 2020 VT 22, ¶ 20, __ Vt. __, 229 A.3d 1026, the words "entities" or "companies" do not appear in the statute—in other words, they were inserted by Wellpath, not the Legislature. See 1 V.S.A. § 317(c)(42). If we were to apply this canon, then, construing the term "public agency" to include Wellpath as an instrumentality of the state would not render any of the language of § 317(c)(42) surplusage. Second, Wellpath invokes noscitur a sociis—a canon meaning "it is known by its associates"—pursuant to which courts are counseled to seek the meaning of an undefined term in light of what follows or precedes it. Vt. Human Rights Comm'n v. Vt. Agency of Transp., 2012 VT 45, ¶ 5, 191 Vt. 485, 49 A.3d 149. It argues that because "instrumentality" and "authority" appear in a list of entities which are subordinate bodies of state government, they must be as well. Even if we were to invoke this canon here, we do not understand it to require that, wherever a statutory list exists and a certain designation can be applied to the majority of the terms within it, all other terms therein must be understood as subject to the same designation, even where their ordinary meaning is not thus confined.

notice that, in certain circumstances, they may be subject to its provisions. These concerns are well-taken, and we do not disagree that some incongruencies or administrative difficulties may inhere as a result of the Act's application to instrumentalities like Wellpath. However, weighed against the plain language of the statute and the Legislature's forcefully expressed intent that it be interpreted in favor of disclosure, these concerns must yield. It is for the Legislature to resolve such nuances; it is for this Court to interpret the provisions of the Act on appeal in this case in a way that upholds, rather than defeats, the PRA's plain language and the overriding goal of open government—a goal that is nothing less than foundational to our republic. In the words of John Adams,

> Liberty cannot be preserved without a general knowledge among the people, who have a right . . . and a desire to know; but besides this, they have a right, an independent right, an indisputable, unalienable, indefeasible, divine right to that most dreaded and envied kind of knowledge, I mean of the characters and conduct of their rulers.

J. Adams, A Dissertation on Canon and Feudal Law (1765).

¶ 23. The trial court erred in granting summary judgment for Wellpath because, considering all relevant factors, Wellpath was an instrumentality of the state during the contract period, and thus a "public agency" as that term is defined in the PRA. Because of the trial court's disposition below, it did not consider whether the requested documents were "public records" within the meaning of the PRA or whether any statutory exemption applied thereto. We therefore leave these questions for its consideration upon remand.

Reversed and remanded for proceedings consistent with this opinion.

FOR THE COURT:

---

Associate Justice

12