NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 65

No. 22-AP-324

| | |
|---|---|
| In re Vermont Permanency Initiative, Inc. Denial (Concerned4Newbury, Inc., Appellant and Town of Newbury, Cross-Appellant) | Supreme Court |
| | On Appeal from |
| | Superior Court, Environmental Division |
| | May Term, 2023 |

Thomas G. Walsh, J.

Nicholas A.E. Low and Ronald Shems of Tarrant, Gillies & Shems, Montpelier, for Appellant Concerned4Newbury, Inc.

Charity R. Clark, Attorney General, and Ryan P. Kane and Melanie Kehne, Assistant Attorneys General, Montpelier, for Appellee Vermont Department for Children and Families.

Jon T. Anderson, Burlington, for Appellee Vermont Permanency Initiative, Inc.

James W. Barlow of James W. Barlow PLC, Danville, for Appellee/Cross-Appellant Town of Newbury.

Rachel Seelig and Susan Garcia Nofi (Disability Law Project), and Rachel Batterson & Matthew M. Shagam (Housing Discrimination Law Project), Vermont Legal Aid, Inc., Burlington, for Amicus Curiae Vermont Legal Aid, Inc.

PRESENT: Reiber, C.J., Carroll, Cohen and Waples, JJ., and Morris, Supr. J. (Ret.), Specially Assigned

¶ 1. **REIBER, C.J.** This appeal concerns a request for a zoning permit from the Town of Newbury by the Department for Children and Families (DCF) and the Vermont Permanency

Initiative, Inc. (VPI), to renovate a property owned by VPI for the purpose of creating a secure facility for housing justice-involved youth. The Environmental Division granted summary judgment to DCF and VPI, concluding that the undisputed facts demonstrated that the facility was entitled to preferential zoning review as "a group home" for "persons who have a disability" under 24 V.S.A. § 4412(1)(G). The Town and a community organization Concerned4Newbury (neighbors) appeal,[1] arguing that DCF lacked standing to appeal to the Environmental Division because it did not have a sufficient interest in the property and that the facility does not meet the statutory definition of a group home because it is a detention center not designed for treatment of those with a disability. We affirm.

## I. Overview and Procedural History

¶ 2.     VPI holds an existing permit to operate a residential treatment facility on property it owns in the Town. In July 2021, VPI filed a zoning application with the Town's Development Review Board (DRB) seeking to renovate the property to house juveniles at a higher level of security. The application indicated that the proposed facility would be leased to DCF, which would fund the renovations, and that VPI would enter into a contract with DCF to operate the facility. VPI sought an exemption from conditional-use review as "[a] residential care home or group home" under 24 V.S.A. § 4412(1)(G). The DRB concluded that the proposed facility was not a residential care home or group home within the meaning of § 4412. The DRB found the proposed renovations would require extensive physical changes to enhance the property's security, including

---

[1] Neighbors and the Town separately appealed to this Court. Because the Town's notice of appeal was filed second, it was docketed as a cross-appeal. In fact, however, both neighbors and the Town should be designated as appellants since their interests are aligned and they are challenging the same aspects of the Environmental Division's decision. Although the Town and neighbors raise slightly different arguments on appeal, the arguments are collectively referred to as arguments by neighbors.

detention-grade windows, high-impact secure walls, video-camera monitoring with a central security control room, and a twelve-foot-high fence to surround the outdoor recreation area. The DRB determined these security enhancements conflicted with the "family-like or residential" setting typically found in group homes. The DRB concluded that the purpose was not to accommodate disabled youths, but to "provide a high-security detention facility for youths at risk for harm to themselves or presenting a risk to community safety." The DRB therefore denied VPI's application.[2]

¶ 3.     VPI and DCF appealed to the Environmental Division, alleging several errors by the DRB. One question in the appeal to the Environmental Division was whether the facility met the definition of a group home under 24 V.S.A. § 4412(1)(G) and was therefore exempt from conditional-use review as a residential use. VPI and DCF moved for summary judgment, arguing that the undisputed facts demonstrated that the facility was a group home and therefore a permit should be granted as a matter of right. Neighbors opposed summary judgment and moved to dismiss DCF from the case for lack of standing. The Environmental Division resolved both motions in favor of DCF and VPI. The court concluded that DCF's prospective long-term lease was a sufficient interest in the property to provide standing to appeal under 24 V.S.A. § 4465(b)(5), and that the undisputed facts showed that the project was entitled to treatment as a residential use because it was a group home within the meaning of 24 V.S.A. § 4412(1)(G).

¶ 4.     The Town and neighbors appeal. On appeal, they argue that DCF lacked standing to appeal the DRB decision to the Environmental Division. They also contend that summary

_____

[2] VPI proposed other bases for permitting the renovations for the facility. The DRB also rejected those arguments. Those determinations are not part of this appeal.

judgment was improperly granted to DCF and VPI because the undisputed facts do not show that the proposed facility will be a group home serving those with a disability.

## II. Standing

¶ 5.     We first address neighbors' argument regarding DCF's standing to appeal the DRB decision to the Environmental Division. Standing to appeal zoning decisions to the Environmental Division is governed by statute and limited to an "interested person, as defined in 24 V.S.A. § 4465." 10 V.S.A. § 8504(b)(1); see V.R.E.C.P. 5(d)(2) (outlining those with party status in appeal to Environmental Division). Section 4465(b)(5) defines an "interested person" as including "[a]ny department and administrative subdivision of this State owning property or any interest in property within a municipality." 24 V.S.A. § 4465(b)(5). In denying the motion to dismiss DCF below, the court relied on the facts that the facility will be licensed by the State, the facility will provide a state function, and VPI will enter a long-term lease with DCF, providing DCF with operational and ownership interest in the property. The court concluded that these interests amounted to "owning property or any interest in property" and therefore satisfied the interested-person standard.

¶ 6.     On appeal, neighbors argue that DCF does not meet the statutory standard because DCF lacks any present ownership in the property. It is undisputed that VPI owns the property at issue and therefore has standing in this matter. Because VPI has adopted all the arguments raised by DCF, it is not necessary to the outcome of the appeal whether DCF also has standing, and we do not reach that question.

III. Summary Judgment

¶ 7.    Neighbors next argue that the Environmental Division erred in granting summary judgment to VPI because the undisputed facts demonstrate that the facility does not meet the definition of group home and it will not serve people with disabilities.

¶ 8.    This Court "review[s] a decision on a motion for summary judgment de novo, employing the same standard as the trial court," and, to prevail on such a motion where no fact is in dispute, a party must demonstrate "that it is entitled to judgment as a matter of law." Gordon v. Bd. of Civ. Auth. for Town of Morristown, 2006 VT 94, ¶ 4, 180 Vt. 299, 910 A.2d 836 (citing V.R.C.P. 56(c)(3)). "The nonmoving party will receive the benefit of all reasonable doubts and inferences." In re Mahar Conditional Use Permit, 2018 VT 20, ¶ 10, 206 Vt. 559, 183 A.3d 1136 (quotation omitted).

A. Background and Statutory Framework

¶ 9.    The following facts are undisputed for purposes of summary judgment. VPI's property at issue is 278 acres and contains a residential building and outbuildings. The property is in the Town's conservation zone and, in 2013, VPI was granted conditional-use approval to operate a "school/residential treatment facility" there. In October 2020, the State's sole facility for the treatment of justice-involved youth closed. The State lacked a secure treatment facility in Vermont to place youth in the custody of DCF. Following a legislative directive, DCF submitted a plan to contract with VPI to renovate VPI's property and create a residential treatment facility for some of the justice-involved youth in DCF custody. The DCF Commissioner in his deposition testified that the facility would serve youth who had been diagnosed or believed to have a psychiatric disorder or mental-health disorder or behavioral disorder. The placement would be made based on a recommendation of DCF, taking into account the treatment needs of the youth

5

and their behaviors. Because a youth must be placed in the least-restrictive setting, the youth will be assessed and moved to a less-restrictive setting if appropriate. Placement of a youth does not depend on whether the youth has been charged with offenses; it is centered on the youth's presentation and behaviors.[3]

¶ 10.    When VPI applied for a permit from the Town, it asserted that the facility was exempt from conditional-use review and should be treated as a single-family residential use under 24 V.S.A. § 4412(1)(G). The statute provides that "[a] residential care home or group home to be operated under State licensing or registration, serving not more than eight persons who have a disability as defined in 9 V.S.A. § 4501, . . . shall be considered by right to constitute a permitted single-family residential use of property." 24 V.S.A. § 4412(1)(G). VPI alleged that the facility met statutory requirements because it was a group home that will be operated under state licensing, serving not more than eight persons who have a disability.

### B.  Analysis

¶ 11.    It is undisputed that juveniles requiring supervision will reside at the facility and that no more than six juveniles will be housed there. The two issues raised on appeal are whether the facility is a "group home" and whether the juveniles will "have a disability as defined in 9 V.S.A. § 4501." 24 V.S.A. § 4412(1)(G).

---

[3]   The DCF Commissioner testified that the type of placement for youth in the juvenile justice system is based on the youth's presentation and that placement in this facility particularly would not be linked to the charged conduct but would be based on the youth's behaviors. The dissent asserts that this evidence is undermined by the Legislature's directive to create a new facility for youth who had historically placed at the now-closed former residential center. Nothing in the legislative directive contradicts the Commissioner's statement that placement is focused on the behavior and presentation of the youth in the juvenile justice system. The record establishes that the overarching purpose for, and function of, the facility is to provide youth with therapeutic placement and treatment for the shortest reasonable time and in the least-restrictive environment.

6

¶ 12.   In construing these terms, we aim to implement the intent of the Legislature and do so by first looking at the plain meaning of the language. In re Bennington Sch., Inc., 2004 VT 6, ¶ 12, 176 Vt. 584, 845 A.2d 332.  "The Court will assume the common and ordinary usage of language in a statute unless doing so would render it ineffective, meaningless, or lead to an irrational result." Id. ¶ 13.  If the language itself does not provide clarity, "we ascertain legislative intent through consideration of the entire statute, including its subject matter, effects and consequences, as well as the reason and spirit of the law." Harris v. Sherman, 167 Vt. 613, 614, 708 A.2d 1348, 1349 (1998) (mem.).  Here, where the statute regards land-use regulation in derogation of common law, "any ambiguity is resolved in favor of the landowner." In re Bennington Sch., 2004 VT 6, ¶ 12 (quotation omitted).

### i.  Group Home

¶ 13.   As to the first challenged requirement, we conclude that the ordinary meaning of the term group home, the purpose of the statute, and the presumption in favor of the landowner all indicate that the proposed facility falls within the meaning of group home.  We begin with the plain language.  The statute itself does not define group home.  "Where, as here, statutory language is undefined, we accord the term its plain and ordinary meaning, which may be obtained by resorting to dictionary definitions." Hum. Rts. Def. Ctr. v. Correct Care Sols., LLC, 2021 VT 63, ¶ 16, 215 Vt. 362, 263 A.3d 1260 (quotation omitted).  The dictionary definition of group home is "a residence for persons requiring care or supervision." Group home, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/group%20home [https://perma.cc/DD8V-8YX4].

¶ 14.   Neighbors generally agree that it is appropriate to apply the meaning of group home from the dictionary.  They argue, however, that the meaning of the definition should be further

informed by other sources.  Neighbors rely on the dictionary definitions of residence and home, which are defined in part as "the place where one actually lives," and "one's place of residence," respectively.       Residence,   Merriam-Webster   Online   Dictionary,   https://www.merriam-webster.com/dictionary/residence   [https://perma.cc/ZS9R-HATG];   Home,   Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/home [https://perma.cc/5X89-D74G]. They also rely on definitions from federal law and an affidavit from a professional planner. Based on these sources, neighbors argue that a group home is an alternative living arrangement that provides disabled persons with residential living so they can be integrated in a residential setting.  Neighbors contend that the facility here does not have the characteristics of a home because it is not intended to be a long-term residence and the security measures will not allow youth to integrate with the surrounding community.  Neighbors assert that the undisputed facts show that residents will use the facility for short periods of time and will not stay there for a long period like a home.  Neighbors also highlight the proposed renovations to install walls, secure areas, bullet-proof windows, and surveillance, as physical characteristics that are more in line with prison-like detention facilities and not group homes.  Finally, neighbors assert that the purpose of the facility will be to detain youth who are either adjudicated or charged with a delinquent or criminal act.  Neighbors therefore argue that because the facility will not resemble a home, it is not eligible for treatment as a group home under § 4412(1)(G).

¶ 15.   Neighbors' arguments improperly place additional requirements on the definition of "group home" that are not contained in the statute.  The statute does not require that residents must have a minimum length of stay for the facility to be regarded as a group home.  See Grp. House of Port Washington, Inc. v. Bd. of Zoning & Appeals of Town of N. Hempstead, 380 N.E.2d 207, 210 (N.Y. 1978) (rejecting argument that group home was not entitled to zoning as family

8

unit simply because children placed there were expected to eventually return to their "natural families"). The statute also does not preclude a group home from having security features. The key characteristics are the facts that the facility will be the sole and primary residence for the youth placed there. The security features are fully consistent with the undisputed evidence that the overarching purpose of the facility is to provide treatment in the least-restrictive environment. This is a critical need, and for some youth, stabilization may depend on the availability of having both a secure and therapeutic environment.

¶ 16. This Court will not read additional requirements into the statute, particularly, where, as here, the purpose of the statute is to preclude local zoning boards from excluding group homes from residential areas. See In re Bennington Sch., 2004 VT 6, ¶ 16 (explaining that predecessor statute to § 4412(1)(G) was designed to prevent exclusion of developmentally disabled and physically handicapped persons from residential areas). In In re Bennington School, we looked at the plain language of a prior version of what is now § 4412(1)(G), and to the Legislature's stated intent in the law to protect those with disabilities. This Court emphasized that the statute's purpose was to preclude municipalities from excluding facilities that served those with disabilities. We underscored that if towns could "rely on evidence beyond the specific statutory requirements to subject qualifying uses to conditional use review, we will have rendered the statute and the Legislature's intent meaningless." Id. ¶ 16. Exempting facilities that provide short-term care for juveniles or that have security features would hamper the legislative purpose.[4]

---

[4] The dissent asserts that the facility is for youth needing a secure placement and is not focused on juveniles with disabilities. These needs are not, however, mutually exclusive. The undisputed facts are that DCF will place youth in the facility based on their treatment needs. That these youth may also require a secured facility does not undermine the unrefuted testimony of the DCF Commissioner that youth will be placed at the facility based on their treatment needs, not the need for security independent of any clinical assessment.

9

Moreover, applying the language so narrowly would violate our policy of construing zoning regulations in favor of the property owner. See In re Weeks, 167 Vt. 551, 555, 712 A.2d 907, 910 (1998) (explaining that "zoning ordinances are in derogation of common law property rights and that in construing land use regulations any uncertainty must be decided in favor of the property owner" (quotation omitted)).

¶ 17. The undisputed facts demonstrate the facility is indeed a "residence for persons requiring care or supervision." According to the undisputed facts submitted for purposes of summary judgment, the facility will house a maximum of six justice-involved youth in a small, residential setting. The youth will be supervised, and the facility will be staffed to provide treatment, support, and nurturance. Youth will be housed at the facility for as short a period as is therapeutically indicated. These facts are sufficient to meet the statutory standard.

### ii. Disability

¶ 18. Next, we turn to the statutory requirement that the group home is for those with a disability, and conclude that the undisputed facts show that the facility will serve those who "have a disability as defined in 9 V.S.A. § 4501." 24 V.S.A. § 4412(1)(G). Section 4501(2) defines " '[d]isability,' with respect to an individual," to mean "(A) a physical or mental impairment that limits one or more major life activities; (B) a history or record of such an impairment; or (C) being regarded as having such an impairment." A physical or mental impairment includes "[a]ny mental or psychological disorder, such as intellectual disability, organic brain syndrome, emotional or mental condition, and specific learning disabilities." Id. § 4501(3).

¶ 19. The undisputed evidence submitted in support of summary judgment includes affidavits from the DCF Commissioner, which describe the purpose of the facility as serving justice-involved youth "who have a disability that limits one or more major life activities." The

Commissioner explained the therapeutic nature of the proposed facility. The Commissioner stated that the facility will be "used primarily for individuals who DCF, based on actual diagnosis or their history or record at the time of presentation, are deemed to require treatment, including diagnostic assessment." He further averred that many justice-involved youth "experience mental disorders, emotional disturbance, and learning challenges." In describing the population that would be treated at the facility, the Commissioner explained that most "will have been formally diagnosed with a mental health disability and/or learning difficulties" prior to placement. The Commissioner acknowledged that DCF would not always have a medical diagnosis prior to placement at the facility but that assessment would occur after placement. After diagnosis, the youth would either remain at the facility or be referred elsewhere.

¶ 20. Neighbors argue that the Commissioner's affidavit is insufficient to demonstrate that youth placed at the facility will have a disability because the affidavit merely makes conclusory statements, and the Commissioner is not a qualified expert on diagnosing disabilities. Because this argument was not presented to the Environmental Division, it is waived on appeal. See Follo v. Florindo, 2009 VT 11, ¶ 14, 185 Vt. 390, 970 A.2d 1230 (requiring argument to be raised below to properly preserve it for appeal).

¶ 21. Neighbors contend that the undisputed facts establish that not every individual placed at the facility will have a disability and therefore the facility does not meet the statutory standard. The undisputed facts are that some individuals will be placed at the facility without a formal diagnosis, but this does not undermine the fact that the facility will serve those with a disability, as required by § 4412(1)(G). As set forth above, disability is defined broadly in the statute. "Physical or mental impairment" is defined to include any "developmental disability, emotional disturbance and "substance use disorders." 9 V.S.A. § 4501(3)(C). The definition does

11

not require an actual diagnosis. The statute includes those "regarded as having" "a physical or mental impairment that limits one or more major life activities." Id. § 4501(2). The undisputed facts establish that the facility will serve justice-involved youth who have a mental-health or learning disability or where there are clinical or behavioral indicators of such.

¶ 22. Neighbors also argue that the facility does not meet the statutory definition because it is designed for individuals who have engaged in criminal or delinquent conduct. The determinative factor under the statute is whether the group home is for juveniles with disabilities. The Commissioner's affidavit confirms that the purpose of the project is to provide treatment for youth who have a disability. The fact that the juveniles who will be placed in the facility are also justice-involved does not negate their disability.

¶ 23. Because the undisputed facts demonstrate that the facility will be a group home and will serve youth who have a disability as defined in § 4501, the Environmental Division properly granted summary judgment to VPI.

Affirmed.

FOR THE COURT:

_____

Chief Justice

¶ 24. **CARROLL, J., dissenting.** Like every Vermonter, I agree that the treatment of justice-involved juveniles is of paramount concern. Nevertheless, the Court must always remain committed to its long-standing principles of statutory interpretation despite the agonizing subject matter raised by some cases. I respectfully dissent because, in my opinion, the majority has not done so here.

12

## I. Group Home

¶ 25. I disagree with the majority's conclusion that summary judgment was appropriately granted in VPI's and Department for Children and Families' (DCF) favor on the question of whether the proposed facility is a group home under 24 V.S.A. § 4412(1)(G). The plain meaning of "group home," the requirement that each youth placed there will have a disability as defined by statute, and the undisputed material facts demonstrate that this facility cannot be considered a permitted single-family residential use under § 4412(1)(G).

¶ 26. Before looking at § 4412's plain language, it is important to bear in mind that the present dispute arises from the Legislature's 2020 directive to the Agency of Human Services to close Woodside Juvenile Rehabilitation Center and to develop "a long-term plan for Vermont youths who are in the custody of [DCF], are adjudicated or charged with a delinquent or criminal act, and who require secure placement (target population)." 2020, No. 154 (Adj. Sess.), § E.316(b), https://perma.cc/2T9V-RW2W; Dep't of Corr. v. Hum. Rts. Comm'n, 2006 VT 134, ¶ 7, 181 Vt. 225, 917 A.2d 451 ("Our paramount goal, when interpreting a statute, is to effectuate the intent of Legislature . . . [which we do] by looking to the statute's language and any legislative history, as well as the legislative policy the statute was designed to implement." (quotation omitted)). The target population is comprised of youths "who have historically been placed at Woodside Juvenile Rehabilitation Center." 2020, No. 154 (Adj. Sess.), § E.316(b)(2), https://perma.cc/2T9V-RW2W. The directive provides nothing about juveniles with disabilities. In contrast, VPI argues that this facility will hold juveniles with disabilities, not those needing secure placement because they have been adjudicated or charged with a delinquent or criminal act. I find the disconnect between VPI's argument and the Legislature's directive telling.

13

¶ 27. Section 4412(1)(G) of Title 24 provides the following: "[a] residential care home or group home to be operated under State licensing or registration, serving not more than eight persons who have a disability as defined in 9 V.S.A. § 4501 . . . shall be considered by right to constitute a permitted single-family residential use of property." In turn, 9 V.S.A. § 4501(2) defines "disability" to mean, "(A) A physical or mental impairment that limits one or more major life activities; (B) a history or record of such an impairment; or (C) being regarded as having such an impairment."

¶ 28. The Legislature has not provided a definition of "group home." Accordingly, the Court gives the term its "plain and ordinary meaning, which may be obtained by resorting to dictionary definitions." Hum. Rts Def. Ctr. v. Correct Care Sols., LLC, 2021 VT 63, ¶ 16, 215 Vt. 362, 263 A.3d 1260 (quotation omitted). I agree that defining group home as "a residence for persons requiring care or supervision" is the plain and ordinary meaning of the term. See Group home, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/group%20home [https://perma.cc/DD8V-8YX4]; ante, ¶ 13. I disagree that the uncontroverted facts support the notion that this group home is a "residence" appropriate for permitted single-family residential use under 24 V.S.A. § 4412(1)(G).

¶ 29. The proposed facility will be a "placement of last resort" for juveniles who have been adjudicated or charged with crimes or delinquency. It will be "architecturally secure." It will be locked 24/7. It will have steel doors and bulletproof windows that cannot be opened. Juveniles held at the facility will never leave the building or the "fenced-in recreational area" except to visit "outside service providers" for services that cannot be delivered on-site. A twelve-foot-high "unclimbable fence" will surround the recreational area. A full-time security officer will have access to a "central security control room" capable of covering the "entire facility" with pole-

14

mounted infrared-video cameras. The building and adjacent fenced recreation area are situated on an approximately 280-acre rural property accessed by two Class 3 roads and a Class 4 road. The purpose of these security features is to protect juveniles held at the facility and to protect the public from them.

¶ 30. In contrast to representations in the record, the proposed facility bears no resemblance to the bed and breakfast it once was. These security features are unrelated to correcting the evil of excluding "developmentally disabled" persons from the benefits of "normal residential surroundings" we have previously identified. In re Bennington Sch., Inc., 2004 VT 6, ¶ 16, 176 Vt. 584, 845 A.2d 332 (quoting legislative policy document accompanying predecessor statute to § 4412(a)(G)). Indeed, a policy of protecting the public is precisely the opposite of requiring municipalities to permit group homes for persons with disabilities so that those persons can enjoy the benefits of ordinary residential life. This is a secure facility that, on its face, carries out the legislative directive to develop "secure placements" for youths "adjudicated or charged with a delinquent or criminal act." I cannot conceive how these juveniles, to the extent that each is diagnosed at the time of placement with a disability, will enjoy the benefits of a "normal residential surrounding" while held at this facility.

¶ 31. The majority holds that the statute does not preclude a group home from having security features. It affirms on the basis that there are sufficient undisputed facts that the facility will be the sole and primary residence for the juveniles held there, and that they will be supervised, treated, and supported in a residential setting. Ante, ¶ 17. In my view, the majority has interpreted group home to be a term capable of meeting any use DCF determines is appropriate. Furthermore, the majority improperly construes the facts in DCF's favor that this facility is a group home under § 4412(1)(G). In re Mahar Conditional Use Permit, 2018 VT 20, ¶ 10, 206 Vt. 559, 183 A.3d 1136

("The nonmoving party will receive the benefit of all reasonable doubts and inferences." (quotation omitted)). The proposed facility is exactly what DCF intends it to be: architecturally secure and designed to house pre- and post-dispositional juveniles who present a danger to themselves and to the public. The Environmental Division's grant of summary judgment to VPI and DCF should be reversed on this basis alone.

## II. Disability

¶ 32. I believe reversal is also appropriate because in order for the facility to qualify by right as a permitted single-family residential use, § 4412(1)(G) unambiguously requires every juvenile placed at the facility to have a disability as defined by 9 V.S.A. § 4501, and it is an undisputed fact that not every youth will have a § 4501 disability before placement. In fact, DCF anticipates that some juveniles with no disability will be held at the facility while they await transfer to a more "appropriate treatment setting as soon as practicable." Nevertheless, the majority concludes that summary judgment was proper here because nothing in § 4501 requires "an actual diagnosis." It explains that § 4501(2)(C), which provides that persons with a "disability" include those "regarded as having" "a physical or mental impairment that limits one or more major life activities," implies that DCF can make its own determinations about who is appropriately placed at the facility in the absence of a diagnosis. Ante, ¶ 21. It concludes that 24 V.S.A. § 4412(1)(G) is not violated because the undisputed facts establish that the facility will serve justice-involved juveniles who either have a diagnosis or have clinical or behavioral indicators of an impairment under § 4501(2)(C). However, if this were true, then there would be no need to diagnostically assess juveniles sent to the facility without a formal diagnosis, much less place them in other facilities upon a finding of no disability.

16

¶ 33. Indeed, DCF's stated intention to evaluate undiagnosed juveniles placed in the facility is a central aspect of VPI's and DCF's argument in this case. If DCF were allowed to hold juveniles at the facility because it alone "regards" them as having an impairment that limits a major life activity, why would it have to make any effort to assess them after placement at all? I submit that it is because § 4501(2) cannot possibly mean what the majority says it means in the context of 24 V.S.A. § 4412. The Legislature did not intend to allow for juveniles to be held in secure facilities because DCF "regards" them as disabled under 9 V.S.A. § 4501(2). State v. Ritter, 167 Vt. 632, 633, 714 A.2d 624, 626 (1998) (mem.) (reversing as absurd result defendant's conviction on two counts of second-degree aggravated domestic assault arising from single act simply because two aggravating factors were present). How could DCF ever be wrong under this standard?

¶ 34. This absurd result highlights the tension between VPI's and DCF's characterization of this facility as one designed as a residence for the care and supervision of juveniles living with disabilities and the undisputed facts concerning its status as an "architecturally secure facility" designed to incarcerate juveniles and to protect the public from them. The result also comes perilously close to pathologizing every justice-involved juvenile in Vermont. Giving DCF near carte blanche to recommend placement of a juvenile in a secure, rural facility because it regards the juvenile as having a disability exposes our justice-involved juveniles to illogical and bizarre incarcerative ordeals, the very issues the Legislature sought to cure by closing Woodside. See 2020, No. 154 (Adj. Sess.), § E.316(b)(2), https://perma.cc/2T9V-RW2W. Indeed, being labeled as having a "disability" merely because DCF "regards" a juvenile as having one raises substantial concerns, including the specter of social stigmatization and reduced opportunities to secure employment, housing and education, among others, in the future. See, e.g., State v. J.S., 174 Vt. 619, 620, 817 A.2d 53, 56 (2002) (mem.) (explaining that collateral consequences flowing from

involuntary hospitalizations "continue to plague [person adjudicated mentally ill] with both legal disabilities and social stigmatization").

¶ 35.   As with its interpretation of the term "group home," the majority again does not draw all reasonable doubts and inferences in neighbors' favor here.  Mahar Conditional Use Permit, 2018 VT 20, ¶ 10.  It is undisputed that DCF intends to place justice-involved juveniles at this facility who have no disability under 9 V.S.A. § 4501.  On its face, this violates § 4412(1)(G), which requires that every person placed at the facility have a § 4501 disability.  DCF cannot skirt that requirement by "regarding" undiagnosed juveniles as having a disability because they are involved in the juvenile-justice system and because "98 percent of Vermont youth placed at Woodside from July 2018 through May 2021 met criteria for a disability as defined" in § 4501.  Expectations do not prove future reality for the purposes of summary judgment, and VPI and DCF are not entitled to it on this question.

¶ 36.   I therefore respectfully dissent.

_____

Associate Justice

18