VERMONT SUPERIOR COURT
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org

ENVIRONMENTAL DIVISION
Docket No. 23-ENV-00140



| | |
|---|---|
| **Hillview Heights, LLC Subdivision Appeal** | **MERITS DECISION** |

In this action, Michael Marks and Sally McCay (Neighbors) appeal a November 15, 2023 decision of the Town of Richmond (Town) Development Review Board (DRB) granting subdivision approval to Hillview Heights, LLC (Applicant) for a 7-lot subdivision of property located at 2427 Hillview Road, Richmond, Vermont (the Property).

In this matter, Applicant is represented by Attorneys David Grayck and Christopher Boyle. Neighbors are self-represented. The Town is represented by Attorneys David Rugh and Beriah Smith. Interested parties Mary and Thomas Collins, Frances and David Thomas, and Kristen Calevro are each self-represented.

The Court held a merits hearing via the WebEx platform on February 7, 2025 and February 10, 2025. Applicant, the Town, Neighbors and the Collins appeared.[1]

### Statement of Questions

There are 5 Questions before the Court in this matter. They ask:

> 1.  Should the Final Subdivision Approval (dated November 15, 2023) be vacated and remanded, or reversed, for failure to present a master development plan as required by Richmond Subdivision Ordinance Sections 610.1 and 310.12?
> 2.  Should the Final Subdivision Approval be reversed because the project will generate more than ten vehicle trip ends in violation of Section 3.1.5 of the Richmond Zoning Ordinance?
> 3.  Should any further development of the Applicant's parcel, including the Lots proposed for subdivision, be prohibited or restricted by conditions to prevent the development of the parcel from

---

[1] The Court notes that this matter was initially brought forth by an appeal of Bradley Holt, David Kauck, and Jason Pelletier. These three initial appellants subsequently reached a settlement agreement with Applicant and did not participate in this matter once that agreement was reached. Further, we note that Frances and David Thomas and Kristen Calevro did not appear at either day of trial.

generating more than ten vehicle trip ends in violation of Section 3.1.5 of the Richmond Zoning Ordinance?

4. Should the Final Subdivision Approval be reversed because the project utilizes Hillview Rd., a town roadway, for access, and the project will burden Town taxpayers and aggravate unsafe highway conditions on Town Highways in violation of [S]ections 500(6) and [(]10[)] of the Richmond Subdivision Ordinance?

5. Should any further development of the Applicant's parcel, including the Lots proposed for subdivision, be prohibited or restricted by conditions to prevent the development of the parcel from burdening Town taxpayers and aggravating unsafe highway conditions on Town Highways in violation of [S]ections 500(6) and [(]10[)] of the Richmond Subdivision Ordinance?

Statement of Questions (filed on Dec. 13, 2023).

## Factual Findings

1. Hillview Heights, LLC owns property having an address of 2427 Hillview Road, Richmond, Vermont.

2. The Property is approximately 85.48 acres.

3. On or about June 22, 2023, Applicant applied for a residential 7-lot subdivision for the Property, resulting in 6 new lots (the Project).

4. The smallest proposed lot is Lot 1, at 1.89 acres, and the largest proposed lot is Lot 7, at 60.78 acres.

5. Lot 7 contains a flower farm operated by Applicant's principal, Tammy Avonda (the Farm Parcel).

6. The Farm Parcel currently has a barn that contains farm-related equipment. Applicant wishes to add a bathroom to the barn. The Farm Parcel also has an existing home.

7. Each lot proposes a single-family home and associated infrastructure, such as a driveway and utilities, including wastewater systems,[2] and there are no proposed lots, including the Farm Parcel, that are devoid of land development as that term is defined by the Town.

8. Applicant has received a wastewater permit for the Project.

9. In connection with the application and this appeal, Applicant has submitted a "master site plan" depicting development, specifically residences with associated infrastructure, on all proposed lots and the Farm Parcel. See Ex. HH-14, p. 1.

---

[2] The Court notes that Lot 1's wastewater treatment is located on Lot 2 but will retain a septic easement onto Lot 2. Plans depict a septic tank and pump station, connected to the treatment system, to be located on Lot 1. See Ex. HH-14.

10. This master site plan was completed by Peter Garceau, a professional engineer licensed in Vermont, and owner of Cross Consulting Engineers, the firm Applicant retained to assist it with the Project.

11. The Project will be accessed by two separate driveways accessed from Hillview Road. See Ex. HH-14 (Site Plans).

12. The proposed access ways have been designed to meet the "Public Improvements Standards & Specifications for the Town of Richmond." See Ex. HH-45.

13. Applicant retained Jennifer Conley, a licensed professional engineer in Vermont, with over thirty years of traffic engineering experience, to review the Project's traffic impacts.

14. The access ways meet stopping sight distances recommended by the American Association of State Highways and Transportation Officials (AASHTO).

15. Ms. Conley undertook a traffic impact analysis for the Project that involved review of relevant standards, the Project and associated documents, and relevant traffic count data retained by the State of Vermont.

16. Ms. Conley used the Institute of Transportation Engineers (ITE) Trip Generation Manual relative to single family detached housing to determine the vehicle traffic during the peak evening hours.

17. Vermont traffic engineers routinely rely upon this manual during the course of their work in designing and permitting development in Vermont.

18. The evening peak hour for the Project is from 5:00 PM to 6:00 PM.

19. The Project will generate 7 total vehicle trips during evening peak hours.

20. The Project will result in a less than 3% increase in traffic at the intersection of Hillview Road and Huntington Road, the nearest intersection to the larger roadway network to the Project.

21. Hillview Road and the roadways it connects to are Town highways maintained by the Town.

22. Hillview Road was upgraded in 2016 and that upgrade included brush cutting, ditching and culvert replacement, underdrain installation in various areas, elevating the southern intersection of Hillview Road to improve sight lines, and installing road fabric and plant mix gravel.

23. These upgrades have improved how Hillview Road performs during mud season.

24. Hillview Road has a 35 mile per hour speed limit.

25. Presently, Hillview Road is a typical Class III gravel road in Chittenden County and is adequate for two-way traffic.

3

26.     Hillview Road does not have limitations that would hinder its capacity for additional development.

27.     The Town has an annual highway department budget of approximately $1,965,945 in fiscal year 2025.

28.     The Town has the capacity to provide emergency services and road maintenance in the Town, inclusive of the Project.

29.     The Town's yearly maintenance costs relative to the Project will be $1,993.47 total per year.  See Ex. HH-110.

30.     This is approximately 0.1% of the Town's highway budget for 2025 and 0.04% of the Town's total annual budget.

31.     No Town debts or tax budget will be impacted by the Project.

32.     Applicant received final subdivision approval from the DRB by decision dated Nov. 15, 2023.

33.     Neighbors timely appealed that decision to this Court.

## Discussion

### I.     Question 1: Compliance with Subdivision Regulations §§ 610.1, 310.12

Neighbors challenge through Question 1 the completeness of the application before the Court.  Specifically, Neighbors assert that Applicant did not submit a master development plan such that the application must be denied.  In turn, Applicant argues that Neighbors are precluded from challenging the completeness of the application pursuant to 24 V.S.A. § 4460(e) such that Question 1 raises issues outside the scope of this Court's jurisdiction and, in the alternative, that Applicant complied with Subdivision Regulations § 610.1.  We address the jurisdictional argument first.

Section 4460(e) states that "[u]nless the matter is an appeal from the decision of the administrative officer, the matter shall come before the panel by referral from the administrative officer. Any such referral decision shall be appealable as a decision of the administrative officer." Functionally, Applicant argues that by referring the subdivision application to the DRB for review, the Zoning Administrator concluded that the application was complete.  Because Neighbors did not appeal the Zoning Administrator's referral decision, Applicant argues that they cannot challenge the finality of that conclusion in this appeal pursuant to 24 V.S.A. § 4472.  The Court disagrees.

When interpreting statutory provisions such as this one, we are directed to give effect to the intent of the Vermont Legislature. In re Vermont Permanency Initiative, Inc. Denial, 2023 VT 65, ¶ 12. We do so by first looking at the plain meaning of the statutory language. In re Bennington Sch.,

4

Inc., 2004 VT 6, ¶ 12, 176 Vt. 584. "The Court will assume the common and ordinary usage of language in a statute unless doing so would render it ineffective, meaningless, or lead to an irrational result." Id. at ¶ 13 (citation omitted).

Section 4460(e), generally, sets forth the scope of an appropriate municipal panel's, relevant here the DRB's, jurisdiction over certain development applications. Applications received by an administrative officer, here the Zoning Administrator, that are subject to review by the DRB, are therefore referred to the DRB. 24 V.S.A. § 4460(e). "Referral" means "[t]he act or an instance of sending or directing to another for information, service, consideration, or decision." *Referral*, Black's Law Dictionary (12th ed. 2024). Section 4460(e) states that the decision to refer an appropriate application to the DRB is appealable to the DRB. Applicant would have the Court interpretate "referral" to include an appeal of the Zoning Administrator's determination that an application is complete. This broad interpretation is inconsistent with the intent of Chapter 117 of Title 24 as it relates to notice to interested persons and appeals of decision and we decline to adopt it.

An interested person may appeal a decision or act of an administrative officer within 15 days of the date of the decision or act. 24 V.S.A. § 4465. Applicant does not direct the Court to, nor is the Court aware, of any provision in Chapter 117 by which an interested person would get notice of the sole act of applying for a subdivision permit. Instead, upon referral to the DRB, the matter is set for a hearing. See 24 V.S.A. § 4449(b) (only requiring public notice when a zoning administrator issues a permit, but not for a denial or referral of an application); see also Subdivision Regulations § 800.3. Rather, the first public notice regarding a referred application does not occur until at least 15 days before the DRB sets the matter for a public hearing. 24 V.S.A. § 4464; see also Subdivision Regulations § 800.3. Nothing within the notice indicates that the referral decision is appealable to the DRB by any interested party or that the failure to appeal the referral would result in the inability of an interested party to challenge the completeness of an application. Id.; see also Subdivision Regulations § 800.3. Instead, the notice must state that failure to participate in the DRB's hearing may impact a party's ability to appeal the DRB's decision to this Court. 24 V.S.A. § 4464; see also Subdivision Regulations § 800.3.

To adopt Applicant's interpretation of § 4460(e) would mean that interested persons, such as Neighbors, would be required to appeal a decision that they may not have received notice of until after the appeal period had run. The first notice that they do receive is not related to that referral decision but is instead related to a public hearing on the application that was referred to the DRB.

5

While there may be aspects of a referral decision that may be appealable,[3] we conclude that Neighbors ability to challenge the completeness of the application before the Court is not foreclosed by their failure to appeal the Zoning Administrator's decision to refer the application to the DRB.[4] Thus, we have jurisdiction to review the application's completeness under Subdivision Regulations § 610.1 and § 310.12.

When interpreting land use ordinances, we apply the rules of statutory construction. In re Appeal of Trahan, 2008 VT 90, ¶ 19, 184 Vt. 262. First, we "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." Id. (citations omitted). If there is no plain meaning, we will "attempt to discern the intent from other sources without being limited by an isolated sentence." In re Stowe Club Highlands, 164 Vt. 272, 280 (1995). In construing statutory or ordinance language, our paramount goal is to implement the intent of its drafters. Morin v. Essex Optical/The Hartford, 2005 VT 15, ¶ 7, 178 Vt. 29. We will therefore "adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578; see also In re Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 22 (quoting Lubinsky v. Fair Haven Zoning Bd., 148 Vt. 47, 49, 195 Vt. 586 (1986)) ("Our goal in interpreting [a zoning regulation], like a statute, 'is to give effect to the legislative intent.'"). Finally, because zoning regulations limit common law property rights, we resolve any uncertainty in favor of the property owner. Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 22. With these provisions of interpretation in mind, we turn to the applicable provisions of the Subdivision Regulations.

Pursuant to Subdivision Regulations § 610.l:

> For any portion of the parcel or LOT not proposed for LAND DEVELOPMENT in the SUBDIVISION as of the application date, a master development plan is required. The master development plan shall conceptually show future roads, future stormwater infrastructure, future building areas, future open areas, and future uses on such remaining land, including those that the SUBDIVIDER expects to offer to the Town of Richmond.

---

[3] For instance, if an applicant disagreed with an administrative officer's decision to refer an application to an appropriate municipal panel and instead believed that the administrative officer should review the application, that appeal may be within the scope of § 4460(e).

[4] We further note that Neighbors have challenged the completeness of the application throughout the entirety of this appeal and the record shows that Neighbors raised this challenge before the DRB.

Subdivision Regulations § 610.1 (capitalization in original). Further, § 310.12 requires that such a master development plan be prepared by, in relevant part here, an engineer. Subdivision Regulations § 310.12.

The Subdivision Regulations define "land development," in relevant part, as "[t]he construction, reconstruction, conversion, structural alteration, relocation or enlargement of any building or any other structure, or of any mining, excavation or landfill, and any change in the use of any building or other structure, or land, or extension of the use of land." Subdivision Regulations, Art. IX ("LAND DEVELOPMENT").

Section 610.1 is ambiguous. This is evident, in part, by the parties, including the Town's, nearly diametrically opposed interpretations of the language. Specifically, it is unclear what § 610.1 requires to be submitted and what the impact is of failing to submit a master plan.

Neighbors argue that to comply with § 610.1, an applicant must submit a document entitled "master development plan" and that document cannot be titled in any other manner. Further, Neighbors argue that the plan must depict conceptual future development on any portion of a proposed lot on which land development is not directly proposed even if that lot is proposed to contain development associated with the subdivision application. According to Neighbors, this is true even if such conceptual land development is not presently contemplated or if the applicant does not intend to undertake any development on the "vacant" portions of a lot proposed to be developed lot. Failure to provide such a plan, according to Neighbors means that the application must be denied or development on the parcel be significantly limited in the future.

Conversely, Applicant and the Town interpret § 610.1 to require a plan, that does not necessarily need to be titled "master development plan," that depicts the scope of the project and, if there is a lot that does not contain any land development on it, then an applicant must depict future conceptual plans for only the vacant lot. In this instance, Applicant asserts that it provided a sufficient "master plan." The master plan as sheet C-1 in Exhibit HH-14 depicts the proposed subdivision with each of the proposed lots containing land development. There are no proposed vacant lots. According to Applicant, it is not required to provide future conceptual plans for the "empty" portions of the developed lots. We agree in both regards.

First, § 610.1 does not require that a master development plan be entitled "master development plan" to be sufficient under the Subdivision Regulations. Thus, to the extent that Neighbors assert that the failure to provide a document titled as such is, in itself, deficient under the Subdivision Regulations, that assertion is contrary to the plain language of § 610.1.

7

Second, § 610.1 states that a master development plan depicting future conceptual development is required "[f]or any portion of the parcel or LOT not proposed for LAND DEVELOPMENT in the SUBDIVISION as of the application date . . .." (emphasis added). This language is ambiguous and we must resolve that ambiguity in Applicant's favor. Thus, we interpret this provision as requiring a master development plan if a subdivision creates a new parcel or lot that is not proposed for land development. If a lot that is to be subdivided creates new lots, each of which are proposed to contain land development as of the application date, conceptual future development plans of "vacant" portions of the to-be developed lots need not be provided.

We are in part guided to this interpretation by the implications of Neighbor's proffered interpretation. Neighbors effectively interpret § 610.1 to require a depiction of future development for any portion of a lot larger than the minimum lot size. It is unclear the bounds of this depiction under Neighbors' interpretation. While Neighbors confusingly assert that conceptual development plans must depicted for the Farm Parcel, which is approximately 60 acres, but not for the 6 new smaller residential lots, each of which is over 1 acre, they provide no understanding of why their interpretation applies to one lot but not the others. Under Neighbors' approach if any applicant proposed a lot larger than 1 acre, the minimum lot size in this district, that applicant would need to depict conceptual development plans for the acreage above the minimum lot size. As evidenced by Neighbors own argument, which declines to address the smaller lots in the Project, that would be an interpretation that would lead to an absurd result that the Court will not adopt. See Billewicz v. Town of Fair Haven, 2021 VT 20, ¶ 26, 214 Vt. 511, 524

Further, the Court is not persuaded by Neighbors' assertion that a full depiction of future development is required to determine the Project's impacts under the relevant regulations. This argument presupposes that the DRB could potentially deny the permit or condition future development based on as-yet applied for and/or potentially not contemplated development. Neighbors have pointed to no provision of the Subdivision Regulations or Zoning Regulations that would give the DRB the authority to deny a subdivision permit or restrict development of a parcel based on conceptual, not yet applied for, and potentially not even contemplated development.[5] We decline to interpret § 610.1 in a manner that would lead to that result.[6] See In re Baker, No. 2006-364,

_____

[5] For the same reason, to the extent Neighbors continue to raise the argument that, by not showing future development on a master development plan, Applicant is foreclosed from future development of the Property, this assertion is not supported by the Subdivision Regulations.

[6] This is particularly true when Applicant's principal has credibly testified that Applicant has no present plans, conceptual or otherwise, to further subdivide the Property. Functionally, Neighbors assert that the DRB could deny a project that would otherwise comply with the Regulations simply because the lot created could, potentially, have the

slip op. at 3 (Vt. May 16, 2007) (affirming environmental court's decision declining to review evidence of future development plans and use of a property as part of a pending subdivision permit application).

Applicant provided a master site plan that was completed by Mr. Garceau, a professional engineer licensed in Vermont. See Ex. HH-14. This plan shows land development occurring on each proposed lot. This plan is sufficient under the Subdivision Ordinance §§ 610.1 and 310.12 and Applicant is not required to submit a plan showing conceptual depictions beyond the application before the Court.[7] As such, we answer Question 1 in the negative.

## II.    Questions 2 and 3: Compliance with Zoning Regulations § 3.1.5

Questions 2 and 3 address whether the Project will violate Zoning Regulations § 3.1.5(d) because the Project will produce more than 10 vehicle trip ends during peak evening hours and whether conditions are required to ensure compliance therewith. Zoning Regulations § 3.1.5(d) requires that traffic impacts from a development in the A/R District shall not exceed 10 vehicle trip ends during peak evening hours.

Applicant provided credible expert testimony from Jennifer Conley, a professional engineer with significant traffic engineering experience, demonstrating that the project would not produce 10 or more vehicle trip ends during evening hours. Ms. Conley's testimony was based on standards used in Vermont and her nearly 30 years of professional experience in Vermont. Ms. Conley relied upon the Institute of Transportation Engineers (IRE) Trip Generation Manual to determine the vehicle traffic during the peak evening hours. Ms. Conley's review of the Project was consistent with professional and industry standards in Vermont. Her analysis concluded that the Project will not violate Regulations § 3.1.5 and will not generate more than 10 vehicle trip ends during evening peak hours. Neighbors provided no contravening expert opinion or evidence demonstrating that the Project will create more than 10 vehicle trips during the evening hours or that demonstrates Ms. Conley's analysis or standard of review as incorrect.[8]

---

capacity to be developed in the future to a level that might not comply with the Regulations. To the extent that Neighbors assert that designing a project in a certain manner, for example to be sized so as to not trigger certain jurisdictional thresholds, should be viewed in some level of a negative light, we decline to do so. Other than ensuring that project applicants comply with the relevant law and regulations, the Court takes no position on how a project applicant seeks to marshal its project forward or how it decides to scope a project to meet its goals.

[7] The Court notes that even if it were to conclude that the plan was somehow insufficient, there is nothing in the Subdivision Regulations to suggest that the entire application must be denied, as suggested by Neighbors.

[8] Neighbors attempt to argue that Ms. Conley should have used the 2003 ITE Trip Generation Manual because it is referenced as a guiding document in other zoning districts in the Regulations. First, it is not used in relation to the A/R District. Second, the iteration used by Ms. Conley in analyzing the Project was simply a different edition of the same manual. As such, the plan language of the Regulations does not dictate that an applicant uses this specific iteration of the manual to analyze a project in the A/R District.

Thus, the Court concludes that the Project complies with § 3.1.5 because it will not generate more than 10 vehicle trips during the evening peak hours. Despite this, Neighbors argue through Question 3 that the Court impose a condition prohibiting further development on the Property from generating more than 10 vehicle trips during evening peak hours, presumably with consideration to the trips generated from the Project.

The Subdivision Regulations state that in granting a subdivision approval, the DRB, and therefore this Court on appeal, may attach "reasonable conditions and safeguards as it deems necessary to implement the purposes of these Subdivision Regulations, the ZONING REGULATIONS, or any other Town bylaws or standards and to mitigate any UNDUE ADVERES EFFECT associated with the SUBDIVISION." Subdivision Regulations § 708 (capitalization in original). For a condition to be reasonable it must be "appropriately tailored to the evidence and findings." In re Champlain Parkway Act 250 Permit, 2015 VT 105, ¶ 12, 200 Vt. 158.[9]

There is no basis to impose the proposed condition. As set forth above, the Project complies with Zoning Regulations § 3.1.5 and will not generate more than 10 vehicle trips during the evening peak hours. There has been no contravening evidence or credible testimony disputing this fact. Applicant has repeatedly testified that it has no plans to further develop the Property and any further subdivision or development outside the scope of this permit would require review and approval from the Town. For these reasons, it would be inappropriate and unreasonable to so stringently condition the Project so as to foreclose Applicant or any subsequent purchaser's development of the Property at this time. We therefore answer Question 3 in the negative.

### III. Questions 4 and 5: Compliance with Subdivision Regulations § 500(6), (10).

Subdivision Regulations § 500 sets forth general planning standards related to subdivisions. It states that "[t]he DRB shall evaluate any application of SUBDIVSION approval in accordance with the following considerations." Subdivision Regulations § 500 (capitalization in original). Questions 4 and 5 address § 500(6) and (10). Subsection 6 requires the DRB to evaluate "[w]hether the proposed SUBDIVISION, when reviewed in the context of the Town's adopted capital budget and program, and other developments in the Town, will place an unreasonable burden on the ability of the local government units to provide municipal or governmental services and facilities[.]" Subdivision Regulations § 500(6). Subsection 10 requires evaluation of "[w]hether the proposed SUBDIVISION

---

[9] The Court notes that Champlain Parkway concerned a condition imposed in the Act 250 context. The Court believes that its interpretation of what would constitute a "reasonable" permit condition is relevant in the present context, because conditioning in both contexts must be "reasonable."

will cause unreasonable highway congestion or unsafe conditions with respect to the use of roads and highways in the Town[.]" Subdivision Regulations § 500(10).

With respect to § 500(6), the Town Manager, Josh Arneson, who oversees the preparation of Town budgets and reports, credibly testified that the Town's municipal budget will not be impacted by the Project. The Town has the capacity to provide emergency services and road maintenance, inclusive of the Project. Further, the yearly maintenance costs to the Town relative to the project will be $1,993.47 per year total. This is 0.04% of the Town's total annual budget. There is no controverting evidence in the record to dispute the evidence of impacts to the Town's budgeting or programs, or ability to provide services and facilities. Thus, we conclude that the Project will not place an unreasonable burden on the Town's ability to provide municipal or governmental services and facilities.

With respect to § 500(10), the uncontroverted evidence presented to the Court demonstrates that the Project will not cause unreasonable highway congestion or unsafe conditions with respect to use of Town roads and highways. Hillview Road is a Class III gravel road with a 35 mile-per-hour speed limit. [10] In 2016 it was upgraded, which included brush cutting, ditching and culvert replacement, underdrain installation in various areas, elevating the southern intersection of Hillview Road to improve sight lines, and installing road fabric and plant mix gravel. These upgrades have improved how Hillview Road performs during mud season. Further, as set forth above, the residential subdivision will not produce more than 10 vehicle trip ends during evening peak hours and will result in a less than 3% increase in traffic at Hillview Road and Huntington Road, the nearest intersection to the Project connecting Hillview Road to the larger road network. Finally, the newly proposed subdivision roads were designed to comply with the "Public Improvements Standards & Specifications for the Town of Richmond." Sight distances at all proposed driveway intersections with Hillview Road comply with those required by the American Association of State Highways and Transportation Officials (AASHTO).

No interested party before the Court, including Neighbors, provided any testimony from any witness to contravene the evidence presented to the Court. No testimony has been provided in any respect, but particularly to the extent that Hillview Road is unsafe or overburdened. Instead, this evidence establishes that Hillview Road is a typical Vermont Class III road that can safely support the

---

[10] Neighbors, on cross examination of Mr. Gosselin, attempted to question him on the applicability of the "Public Improvements Standards & Specifications for the Town of Richmond," Exhibit HH-45, to Hillview Heights relative to the Project. This document pertains to the construction or reconstruction of roads. The Project proposes no changes to Hillview Road.

Project, including relative to sight distances, and that the newly proposed roads and driveways will satisfy relevant standards and have safe sight distances. Thus, we conclude that the Project will not result in unreasonable highway congestion or unsafe conditions with respect to the use of roads and highways in the Town.

For these reasons, we answer Question 4 in the negative. Further, and for the same reasons as with respect to Question 3, the Court must answer Question 5 in the negative. Question 5 asks this Court to impose a condition on the Property prohibiting or restricting further development of the Property to effectively ensure compliance with Subdivision Regulations § 500(6), (10). For the reasons set forth herein, the Project as proposed complies with both provisions. Any further land development of the Property, as defined by the Zoning Regulations and Subdivision Regulations, requires Town review. There is no basis to impose such an exacting condition, prohibiting further development of the Property, upon a project that, as proposed, complies with these provisions.[11] We therefore decline to do so.

## Conclusion

For the foregoing reasons, the Court concludes that Applicant complied with Subdivision Regulations § 610.1 by providing a "master development plan." Further, we conclude that the Project complies with Zoning Regulations § 3.1.5 because it will not generate more than 10 vehicle trips during evening peak hours. With respect to Subdivision Regulations § 500(6) and (10), the Project will not result in an unreasonable burden on the Town's ability to provide municipal or governmental services and facilities nor will it result in unreasonable highway congestion or unsafe conditions with respect to the use of roads and highways within the Town. For these reasons there is no need to impose a

---

[11] Conversely, there is no argument that there are characteristics at the Property outside of those included on site plans or what is proposed to be developed that would require limitations on future development. For example, Zoning Regulations identifies area that are deemed incapable of supporting any land development. See Zoning Regulations § 2.5.2 (identifying areas of a lot that contain certain features, such as wetlands or waterbodies, steep slopes, rights of ways, or certain lands within a flood hazard district as being "deemed incapable of supporting any [l]and [d]evelopment"). There is no assertion that there are such features that would require the Court to condition the Project to allow for future preservation of those areas. In any event, should any application come forward for development of these lands, again, the application must comply with the applicable regulations in effect at that time.

condition or conditions on the Project restricting or prohibiting further development of the Property. We therefore answer each Question in the negative. Having reached these conclusions, the DRB's decision stands.

This concludes the matter before the Court. A Judgment Order accompanies this Decision.

Electronically signed 9th day of April 2025 pursuant to V.R.E.F. 9(D).

Thomas G. Walsh, Judge
Superior Court, Environmental Division